2004 OK CR 19

**James Lewis DeROSA, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2001–1416.**

Court of Criminal Appeals of Oklahoma.

April 22, 2004.

James T. Rowan, Jason Spanich, James H. Lockard, Oklahoma Indigent Defense System, Capital Trial Division, Norman, OK, Attorneys for Defendant at trial.

Robert A. Wallace, LeFlore County District Attorney, Farley Ward, Jeff Mixon, Assistant District Attorneys, Poteau, OK, Attorneys for the State at trial.

James Lockard, Capital Direct Appeals, Oklahoma Indigent Defense System, Capital Trial Division, Norman, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## *OPINION*

CHAPEL, Judge:

¶ 1 James Lewis DeRosa was tried by jury and convicted of two counts of First–Degree Felony Murder (Robbery with a Dangerous Weapon), in violation of 21 O.S.Supp.2000, § 701.7(B), in the District Court of LeFlore County, Case No. CF–2000–635.[1] On both counts, the jury found each of the two aggravating circumstances alleged: (1) that the murder was "especially heinous, atrocious, or cruel"; and (2) that the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution."[2] In accordance with the jury's recommendation, the trial court, the Honorable Doug Gabbard, II, sentenced DeRosa to death on both counts. DeRosa has properly perfected this appeal of his convictions and sentences, raising nine propositions of error.[3]

¶ 2 Around 9:00 p.m. on Monday, October 2, 2000, James L. DeRosa and John Eric

---

1. The Information and the Judgment and Sentence documents both incorrectly cite 21 O.S., § 701.7(A), which applies to first-degree "malice aforethought" murder. Yet the Information clearly charged DeRosa with First–Degree Felony Murder, with Robbery with a Dangerous Weapon as the underlying felony; and DeRosa's jury was instructed upon—and convicted him based upon—this felony murder theory. Hence DeRosa's Judgment and Sentence must be corrected to reflect the provision under which DeRosa was actually convicted.

2. *See* 21 O.S.1991, § 701.12(4) and (5), respectively.

3. DeRosa's Petition in Error was timely filed on March 8, 2002. On May 21, 2003, DeRosa filed his brief in the appeal. The State filed its response brief on September 18, 2003. DeRosa filed his reply to the State's brief on October 8, 2003. Oral argument before this Court was held on January 13, 2004.

Castleberry talked their way into the rural Poteau home of Curtis and Gloria Plummer and then robbed them, stabbed them, and cut their throats, leaving them dead on the floor. DeRosa and Castleberry then stole approximately $73 and left in the Plummers' tan 1998 Chevrolet pickup truck. The Plummers knew DeRosa, because he had previously worked for them on their ranch. He and Castleberry were apparently allowed into the home, which had a security system, on the pretense of looking for a further work opportunity.[4]

¶ 3 DeRosa worked for the Plummers during the summer of 1999.[5] He apparently began plotting to rob them sometime in the spring of 2000. Chris Ford testified that during March or April of 2000, while DeRosa was renting a room in his home, DeRosa approached him about an elderly couple in Monroe for whom he had worked. DeRosa said they would be an "easy target" and asked Ford to drop him off at their house, and then DeRosa would go in and rob them.[6]

¶ 4 On Saturday, September 30, 2000, DeRosa brought up the idea of robbing the Plummers to Eric Castleberry and Scotty White.[7] The three men were hanging out in a bowling alley parking lot that night, when

DeRosa asked White if he would go with him to a house in Howe, which belonged to people for whom he had previously worked, and help him rob the owners.[8] When White declined, DeRosa asked Castleberry, and Castleberry agreed. DeRosa claimed that the people "always carried a bunch of money on 'em."[9] Castleberry testified that he and DeRosa needed money in order to move to Corpus Christi, Texas, to find work. DeRosa spoke to Castleberry again the next day, and Castleberry again agreed to go into the house with DeRosa. They talked about using guns, but decided to use knives when they were unable to obtain guns.[10]

¶ 5 On Monday, October 2, 2000, while DeRosa, Castleberry, and White were driving back to Poteau from Fort Smith, Arkansas (where they had been visiting a friend in the hospital), DeRosa told the others, "we're going to do it tonight." They agreed that White would drop DeRosa and Castleberry off at the house, where they would rob the Plummers and steal their old truck, and then White would meet them at the top of Sugarloaf Mountain, where they would abandon the truck. After attempting to track down Mavis Smith, a sister of the friend in the hospital, and getting pulled over for speeding,[11] the men went to their various homes to prepare for the robbery. DeRosa obtained a

4. Castleberry pled guilty to two counts of first-degree murder and testified against DeRosa, in exchange for a sentence of life without the possibility of parole. This Court's description of what occurred within the Plummer home is based upon Castleberry's trial testimony, which was entirely consistent with the physical evidence in the case.

5. Janet Tolbert, the daughter of Curtis and Gloria Plummer, testified that DeRosa was allowed to work on the ranch as a favor to his mother. While DeRosa was working at the ranch, her father would ask Tolbert to check on him and make sure he had plenty of water.

6. DeRosa told Ford that when the man would pay him, he would just pull out his wallet, which had "big bills" in it, and pay him in cash. Ford testified that DeRosa planned to "go in there while they were asleep, gag 'em, tape 'em up, and then just leave with some money and take their vehicle[,] so that way he wouldn't have to walk."

7. Castleberry and White testified that they had known each other between three and six months

at the time, but only known DeRosa for a few weeks. White was initially charged with two counts of first-degree murder, along with DeRosa and Castleberry. He testified against DeRosa at both the preliminary hearing and at trial. By the time of the trial, his charges had been reduced to two counts of accessory after the fact. He later pled guilty to these charges and was sentenced to two twenty-five year sentences, run concurrently, with the last seven years on supervised probation.

8. Howe and Monrore are small towns in LeFlore County located near the Plummers' home.

9. Castleberry and White both testified about the events leading up to and following the robbery and killing of the Plummers. Their testimony was almost entirely consistent.

10. Castleberry asked his friend Justin Wingo about getting a gun; and Christopher Ables testified that on that same Sunday, DeRosa asked Ables if he knew where he could get a gun.

11. Highway Patrol Trooper Jim Sommers testified that at 7:10 p.m. that night, he pulled both

white batting glove or golf glove from his home, but when he couldn't find "the other one," he got a sock to wear on his other hand. He told the others that he was going to get his mother's gun, but then decided against it, since it was registered in her name. Castleberry already had two knives in his car, and they decided to use those instead.[12] Castleberry also had thick black rubberized gloves for himself in his car.

¶ 6 DeRosa gave White, who was by then driving Castleberry's car, directions to the Plummer home, and they arrived at approximately 9:00 p.m. DeRosa told White to check back in about ten to fifteen minutes, in case someone else was in the home. White did so, and after seeing lights on throughout the home and no sign of his friends, drove on to Sugarloaf Mountain.[13] Meanwhile, DeRosa and Castleberry, who were not wearing disguises or masks, rang the bell at the Plummer home and were allowed in by Mrs. Plummer, in order to talk to Mr. Plummer about possible work opportunities.[14] Mr. Plummer was in the den watching Monday Night Football. After chatting in their den for a few minutes, DeRosa pulled out his

knife, held it to the neck of Mr. Plummer, and told him to sit still. When Mrs. Plummer grabbed the cordless phone and started trying to dial, Castleberry yanked the base of the phone out of the wall, pulled out his knife, held it to Mrs. Plummer's neck, and told her to sit still.

¶ 7 DeRosa stayed in the den with the Plummers while Castleberry began going through bedrooms looking for things to steal. While he was in the second bedroom, he heard DeRosa yell for him to come back and help him. Castleberry ran back to the den and observed DeRosa, now standing near the door to the kitchen, struggling with the Plummers. Castleberry testified that he saw DeRosa stabbing at both of them and that he saw blood "all over" Mrs. Plummer.[15] Castleberry also observed blood on the front and the side of Mr. Plummer and saw DeRosa stab Mr. Plummer in the chest.[16]

¶ 8 Castleberry testified that he then went up behind Mrs. Plummer, stuck his knife to her throat, slit her throat, and pulled her backwards and threw her down on the loveseat.[17] Castleberry then stabbed Mr. Plummer "a couple of times" in the back.[18] DeRo-

---

Castleberry and Smith over for speeding, and that White and DeRosa were in Castleberry's car.

12. Castleberry testified that one of the knives was a green-handled, "old-timer knife," approximately twelve to fourteen inches long, and that the other was a lock-blade buck knife, which was about eight to nine inches long with the blade open. Castleberry and White both testified that Castleberry took the green-handled knife, and DeRosa took the buck knife.

13. White testified that he waited on top of Sugarloaf Mountain for thirty to sixty minutes and then came down to the bottom and waited another twenty minutes. He was about to leave when he saw DeRosa drive past, headed up the mountain, in the Plummers' truck.

14. Castleberry testified that it was DeRosa's idea to get into the house by asking about jobs.

15. The medical examiner, Dr. Andrew Sibley, testified regarding all of the wounds to Curtis and Gloria Plummer. Mrs. Plummer had five stab wounds to her back, one of which entered her left lung and another of which went into the liver. Both of these wounds could have been fatal in time. She also had a stab wound in her upper chest area, which passed into the left lung and also the aorta, which would have been fatal within three to five minutes; an incised wound to her left forearm, possibly a "defensive

wound"; and a similar wound to the left side of her chin.

16. Mr. Plummer had two stab wounds on his front side, one in the abdominal area and one to the right collarbone area. He also had superficial wounds on the upper left side of his chest, and one of the stab wounds on his back was on the lower right side.

17. Mrs. Plummer had two significant wounds to her neck and throat area. One was a long wound on the bottom left side of the chin, extending down onto the neck. According to Dr. Sibley, the "question mark shape" of this wound indicated "movement" going on between the knife and the victim, and the wound would have been fatal over time. The other wound was a very jagged and complex wound on the right side of the neck, approximately four inches in length. This wound transected the windpipe and the right carotid artery and jugular vein. Dr. Sibley testified that the skin flaps and jagged edges of the wound indicated multiple passes or a "sawing action."

18. Mr. Plummer had four stab wounds on his back. One of the wounds passed into the left lung and produced a significant amount of blood loss into the chest cavity. Another wound passed into the right lung. These two wounds would likely have been fatal over time, but not immediately.

sa then pushed Mr. Plummer back toward the love seat and the television. Castleberry testified that Mr. Plummer picked up the cordless phone, which was on the floor, and begged the men to let him call an ambulance for his wife, saying he would give them anything they wanted if they would just let him get help for his wife. DeRosa responded by picking up a marble-topped end table and throwing it at him. The table hit Mr. Plummer on the head, and he fell to the ground.[19] DeRosa then walked over and slit his throat, from ear to ear, and left him laying on the floor.[20] Castleberry then pulled Mrs. Plummer down off the loveseat and left her face-down on the floor, near Mr. Plummer.[21]

¶ 9 The men then began ransacking the house looking for cash and other valuables, but they found only Mr. Plummer's wallet and Mrs. Plummer's purse. DeRosa took the cash out of the wallet, and Castleberry dumped the purse onto the laundry room floor and took the cash.[22] When they couldn't find the keys for the older white pickup parked outside, they decided to take the much newer, tan Chevrolet pickup that was parked in the garage. DeRosa drove the truck to the top of Sugarloaf Mountain, but decided not to leave it there, thinking it would be "too obvious." They met White on their way back down. DeRosa told White to wait for a few minutes and then meet them at the Poteau City Lake.

¶ 10 Castleberry testified that when they got to the City Lake, they "[p]ut the truck in the water and got in the water and rinsed the blood off us and changed clothes." White testified that as he pulled up, he could see the back of the truck and its taillights, as the truck sank into the lake. DeRosa and Castleberry put their wet, bloody clothing into a black plastic garbage bag and put on fresh clothing, from out of Castleberry's car. Castleberry testified that he put all of his wet clothing into the bag except his underwear, which he couldn't find, and that he threw his gloves and his knife into the lake.[23] DeRosa put his knife into the bloody sock that he had worn on his hand and threw it into the water too.[24]

¶ 11 The three men then got back in Castleberry's car, drove to Taco Bell, and bought themselves tacos using the money they had stolen. Before dropping White off later that night, Castleberry told White that they "ended up having to kill 'em." [25] White was also told that Castleberry and DeRosa were leaving for Corpus Christi the next morning.

¶ 12 Castleberry and DeRosa later went to a campground area and burned the clothing in the garbage bag, after spraying lighter fluid on it. They were afraid that DeRosa's combat boots would not burn fully, so they dropped them over a bridge near Keota Landing. Later that night Castleberry told their friend Justin Wingo, in DeRosa's presence, that they had just killed two people and

19. Mr. Plummer had a blunt force wound to the left side of the head, as well as abrasions to the left side of his face and a significant cut on his right cheek.

20. The incised wound on Mr. Plummer's neck was about seven inches in length and transected the trachea, the esophagus, and all the major arteries and veins in the neck, passing all the way to the spinal column. Dr. Sibley noted that the jagged areas around the wound did not indicate a "single pass," but rather a repositioning and "sawing type of motion."

21. The numerous pictures of the crime scene that were entered into evidence were entirely consistent with Castleberry's description of what happened.

22. Castleberry testified that DeRosa said there was $73 in Mr. Plummer's wallet and that DeRosa took the cash and stuck it in his pocket.

23. On October 4, 2000, Castleberry's still damp underwear was discovered on the ground near where the truck had been submerged. On Octo-

ber 12, 2000, an investigator found his two black rubber gloves floating in the lake, approximately 100 feet apart.

24. Although investigators searched the lake for the knives, they were never recovered.

25. White testified that while they were at the Lake, DeRosa told him that they had stolen $63 from the Plummers and "trashed the house." White stated that he "felt something wasn't right," after seeing DeRosa's white baseball glove, with blood on it, on the ground. White testified that before he was dropped off at home that night, he asked what happened, and Castleberry said, "We didn't only rob 'em, we killed 'em." White also testified that DeRosa stated that he had stabbed the old man in the back and cut his throat, and that he had picked up a marble table and thrown it at the old man. DeRosa was worried about leaving fingerprints on the marble table. White testified that he did not know beforehand that anyone was going to be hurt or killed in the robbery.

how they had done it.[26] The next day Castleberry and DeRosa drove to Corpus Christi, Texas, to the home of Castleberry's father.

¶ 13 The Plummer bodies were discovered the morning of October 3, 2000.[27] On the morning of October 4, 2000, Scotty White, who was eighteen years old and a high school senior at the time, informed a teacher at his high school that he knew who killed the Plummers. Later that morning he met with Sheriff Kendall Ballew and investigator Shawn Ward, in the principal's office, and told them that DeRosa and Castleberry had killed the Plummers, how they did it, what they did with the Plummers' truck, and that they had left for Texas. After the interview the officers discovered the truck in the Poteau City Lake, right where White said it would be.

¶ 14 Although White initially tried to minimize his own involvement, saying that the other men just told him about what had happened, the investigating officers were suspicious about the extent of his knowledge, and took him to the district attorney's office for further interviewing. Shortly after 1:00 p.m. that afternoon, after White was Mirandized, he told the investigating officers additional details about what had happened, including the fact that he had dropped the others off at the Plummer home. In a third interview, conducted after a break of only a

few minutes (in order for White to look at an atlas), White told them that DeRosa and Castleberry had gone to Corpus Christi.

¶ 15 Castleberry and DeRosa were arrested by local officers in Corpus Christi, outside the home of Castleberry's father, that same evening. When the arresting officer informed DeRosa that he was being arrested on two counts of first-degree murder in an Oklahoma case, DeRosa said, "Yeah, I heard about what happened to those people. We had just visited 'em so my prints are probably out there." Sheriff Ballew and Shawn Ward arrived in Corpus Christi on October 5, 2000, to transport DeRosa and Castleberry back to Oklahoma. After being advised of his Miranda rights and agreeing to waive them, Castleberry agreed to talk with Ballew and Ward. Though he initially denied involvement in the Plummer killings, Castleberry then relented, and in a tape-recorded interview, told Ballew and Ward essentially the same detailed story that he testified to at trial.

## ISSUES RELATING TO JURY SELECTION AND COMPOSITION

■ ¶ 16 In Proposition III, DeRosa argues that the trial court's denial of his change of venue motion forced him to be tried in a community pervaded by prejudicial publicity. On January 16, 2001, he filed a motion for change of venue, seeking to have his case moved out of the sixteenth judicial district.[28] The motion noted that DeRosa

---

**26.** Wingo testified that he was riding in the front passenger seat of Castleberry's car, with Castleberry driving and DeRosa in the back, when Castleberry told him that they went to the home of two people, who DeRosa used to worked for, and robbed them, stabbed them, slit their throats, took their money, and then stole their truck and drove it into the City Lake. Wingo testified that Castleberry was doing most of the talking, but that DeRosa was "agreeing with it and backing it up," and that DeRosa said that he had "killed the old man . . . . hit him in the head with an end table and slit his throat and stabbed him." Wingo testified that he thought Castleberry was playing a joke on him, but that when he found out, the next day, about a statewide manhunt for Castleberry and DeRosa, he told his parents what he knew, and they called the police.

**27.** The bodies were discovered by Roger Murray, who worked for the Plummers around the ranch at the time, and Tonya Woodruff, their granddaughter. Murray contacted Woodruff, who lived nearby and had a key to the home, when

the Plummers did not answer their door that morning.

**28.** The motion attached ten newspaper articles covering the Plummer killings and the capture and charging of the defendants, as well as three articles related to DeRosa's short-lived escape and recapture in December, 2000. It also included three affidavits from residents of LeFlore County, in compliance with 22 O.S.1991, § 561, stating that the affiants did not believe DeRosa could get a fair trial in LeFlore County, due to the intense publicity surrounding the case and subsequent prejudice in the minds of inhabitants of that county. By complying with this provision, the affidavits created a question of fact that had to be resolved by the trial court, i.e., whether an impartial jury could be impaneled in that county. See Braun v. State, 1995 OK CR 42, 909 P.2d 783, 792, cert. denied, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 559 (1996); Bear v. State, 1988 OK CR 181, 762 P.2d 950, 953; Walker v. State, 1986 OK CR 116, 723 P.2d 273,

was attempting to hire an expert to conduct a scientific public opinion poll and requested an evidentiary hearing. The trial court ruled that it was taking the issue under advisement, until the time of the trial. DeRosa asserts that the trial court abused its discretion by refusing to conduct a pre-trial evidentiary hearing on his change of venue motion and that the court's ultimate denial of this motion deprived him of a fair trial.

¶ 17 The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." [29] And a fair trial in a fair tribunal has been recognized as a basic requirement of due process.[30] Yet the United States Supreme Court and this Court have long recognized that "impartial, indifferent jurors" need not come into the courtroom totally unaware of the case that they are called upon to try.

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.[31]

Hence the Supreme Court and this Court have long held that when evaluating whether a juror is sufficiently impartial to be allowed to serve, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." [32]

¶ 18 Nevertheless, prejudicial pretrial publicity certainly can taint a jury to the extent that a fair trial is denied the accused.[33] And a change of venue, to a location less affected by such publicity, is an appropriate method of attempting to ensure a fair trial in a highly publicized case, particularly if the coverage has been inaccurate or jeopardized one of the defendant's specific constitutional rights.[34] Because there is a rebuttable presumption that an accused can receive a fair trial in the county in which the charged offense occurred,[35] a defendant seeking a change of venue must show, by clear and convincing evidence, that potential jurors in

278, *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986).

**29.** *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

**30.** *See id.*

**31.** *Id.* at 722–23, 81 S.Ct. at 1642; *see also Braun*, 909 P.2d at 793 (quoting *Irvin*). If the 1961 Supreme Court was impressed by the media of that time period, the Justices could scarcely have imagined how methods of communication would have evolved by the time of DeRosa's trial, in 2002. Indeed, if the most qualified jurors in 1961 would likely have had some awareness of a "big case," one might wonder about the quality of citizen jurors in the current era who, despite the amazing range and accessibility of news outlets, attest that they have "never heard of" a notorious case.

**32.** *Irvin*, 366 U.S. at 723, 81 S.Ct. at 1643; *Braun*, 909 P.2d at 793 (quoting *Irvin*). The *Irvin* Court commented, "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." 366 U.S. at 723, 81 S.Ct. at 1642–43.

**33.** *See, e.g., id.* at 725–28, 81 S.Ct. at 1644–45 (overturning murder conviction where "barrage" of publicity, including reports that defendant had confessed to six murders and offered to plead guilty, created "pattern of deep and bitter prejudice" against defendant, both in community and on jury); *Rideau v. Louisiana*, 373 U.S. 723, 724–26, 83 S.Ct. 1417, 1418–20, 10 L.Ed.2d 663 (1963) (conviction overturned where defendant's confession had been repeatedly broadcast in community where trial held); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (conviction overturned upon showing of extensive pretrial publicity, including live televising of pretrial hearings); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (conviction overturned due to massive, pervasive and prejudicial publicity, both prior to and during trial).

**34.** In *Sheppard v. Maxwell*, the Supreme Court noted, "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Id.* at 363, 86 S.Ct. at 1522.

**35.** *See Hain v. State*, 1996 OK CR 26, 919 P.2d 1130, 1136, *cert. denied*, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996); *Braun*, 909 P.2d at 792; *Bear*, 762 P.2d at 953.

the relevant community have been exposed to adverse publicity from which they are likely to be prejudiced, such that trying the defendant in that community is likely to result in an unfair trial.[36]

¶ 19 On the other hand, if a trial court denies a defendant's change of venue motion and the defendant is then tried and convicted, the question is no longer about hypothetical and potential unfairness, but about what actually happened during the defendant's trial.[37] In *Murphy v. Florida*,[38] the Supreme Court recognized two different scenarios regarding potentially prejudicial media influence on jurors, requiring two different approaches on review. First, there are cases in which "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." [39] In such cases convictions are obtained "in a trial atmosphere that has been utterly corrupted by press coverage." [40] The Court concluded that in these rare cases, prejudice against the defendant must be presumed and any conviction overturned.[41]

¶ 20 The *Murphy* Court likewise recognized the much more common situation, where jurors were exposed to some amount of information about a defendant or the crimes charged, but not to the extent that a fair trial was rendered almost impossible.[42] In this situation, a reviewing court must evaluate the totality of the circumstances surrounding the defendant's trial, in order to determine whether, in fact, the defendant was tried before a fair and impartial jury.[43] Our Court has adopted the two-pronged approach of *Murphy*.[44]

¶ 21 On appeal, this Court focuses not on the jurors who might have been impaneled, but on the jurors who actually were impaneled. Hence the question becomes whether the record suggests that the jurors before whom DeRosa was tried were able to lay aside any prior knowledge or opinions regarding the case, and render a verdict based upon the evidence presented in court.[45] Because evaluation of juror impartiality is a factual inquiry, based largely upon numerous credibility determinations, this Court will not

---

**36.** In *Brown v. State,* 1994 OK CR 12, 871 P.2d 56, 61–62, this Court clarified that a defendant need not show that it will be "virtually impossible" to receive a fair trial in the county in which the change of venue motion is filed. Rather, the "correct test" evaluates not whether a fair trial in the given county is virtually or actually "impossible," but whether "the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that ... a fair and impartial trial there [is] improbable." *Id.* at 62 (quoting *Wininegar v. State,* 1953 OK CR 97, 97 Okla.Crim. 64, 257 P.2d 526, 531). *See also Coates v. State,* 1989 OK CR 16, 773 P.2d 1281, 1287 (change of venue should have been granted "as there was a 'reasonable possibility of prejudice [arising from] wide-spread pre-trial publicity ...' ") (quoting *Scott v. State,* 1968 OK CR 171, 448 P.2d 272, 274). Merely showing that adverse publicity occurred is inadequate. *See Hain,* 919 P.2d at 1136.

**37.** *See Braun,* 909 P.2d at 792 ("Even if sufficient reasons exist so that the trial court would have been justified in granting a motion to change venue, we will not reverse the lower court's decision unless the circumstances surrounding the trial compel it.") (internal citation omitted).

**38.** 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

**39.** *Id.* at 799, 95 S.Ct. at 2035.

**40.** *Id.* at 798, 95 S.Ct. at 2035. The *Murphy* Court recognized that the state-court convictions

in *Irvin, Rideau, Estes,* and *Sheppard* were overturned for this reason. *Id.* at 798–99, 95 S.Ct. at 2035–36.

**41.** *Id.* The *Murphy* opinion notes that the proceedings in *Rideau, Estes,* and *Sheppard* "were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Id.* at 799, 95 S.Ct. at 2036.

**42.** *Id.*

**43.** *Id.* at 799–800, 95 S.Ct. at 2036–37. The *Murphy* Court conducted this fact-specific inquiry by evaluating the transcript of voir dire in the case, as well as pre-trial publicity about the case. *Id.* at 800–03, 95 S.Ct. at 2036–38.

**44.** *See, e.g., Braun,* 909 P.2d at 792–94; *Walker,* 723 P.2d at 278–79.

**45.** *See Shultz v. State,* 1991 OK CR 57, 811 P.2d 1322, 1329 ("[T]he relevant inquiry on appeal is whether the accused received a fair trial from jurors who could lay aside any personal opinions and base a verdict on the evidence."); *Bear,* 762 P.2d at 953 ("The relevant inquiry on appeal is not whether the community was aware of the case, but whether the jurors impaneled at trial had such fixed opinions that they could not judge impartially the guilt of the accused.").

reverse a denial of a change of venue motion absent a showing of abuse of discretion by the trial court.[46]

 ¶ 22 Hence a defendant seeking relief on appeal must show that the trial court abused its discretion and that, as a result, the defendant was denied his right to a fair trial before an impartial jury. This Court has recognized that in order to evaluate such a claim, our review should focus on (1) the voir dire statements of individual jurors, (2) voir dire statistics, and (3) the atmosphere within the community, as reflected in the news media.[47] DeRosa does not contend that his case is one of the rare cases where media influence was so pervasive and prejudicial that prejudice must be presumed. Hence this Court will evaluate his claim by considering the totality of the circumstances surrounding his trial.

¶ 23 We take up these considerations in reverse order, beginning with a review of the evidence of pretrial media coverage that was before the trial court. DeRosa's original

change of venue motion attached ten newspaper articles covering the Plummer killings and the early developments in the case.[48] The motion also attached three articles describing DeRosa and another inmate's short-lived escape from the LeFlore County Jail.[49]

¶ 24 A number of these articles appeared immediately after the discovery of the Plummer bodies, on October 3, 2000.[50] These articles noted that their rural Poteau home had been ransacked, in an apparent "robbery turned homicide," and that a pickup truck was missing. The arrest and charging of the three original defendants in the case sparked additional coverage.[51] Many of the articles noted that the Plummers had a large extended family in the area and that they were well-known and well-regarded in the community. Some of the articles described the Plummers as "wealthy," and some noted that Curtis Plummer, a "prominent retired businessman," had recently sold his successful beverage distributorship and owned substantial land within the county.[52] Some of the

**46.** See Bear, 762 P.2d at 954 ("Whether jurors have opinions that disqualify them is plainly one of fact and the resolution of such question is entitled to special deference by a reviewing court.").

**47.** See Hain, 919 P.2d at 1137; Walker, 723 P.2d at 278; Braun, 909 P.2d at 793.

**48.** DeRosa submitted five articles from the Tulsa World ("TW") and five articles from the Southwest Times Record ("STR").

**49.** These articles, all dated December 19, 2000, came from the Poteau Daily News & Sun, the Oklahoman, and the Southwest Times Record. The articles reported that DeRosa and another inmate had overpowered a jailer, after talking him into opening their cell door to remove some trash, at around 1:00 a.m., on December 18, 2000. The articles stated that the men hit the jailer on the head with a broomstick and may have held a blanket over his mouth. They noted that the two men were recaptured near a Poteau apartment complex at around 7:30 a.m. that same day.

**50.** Two TW articles (dated 10/03/00 and 10/04/00) and one STR article (dated 10/04/00) covered the discovery of the Plummer bodies and the initial investigation into the case. A separate TW article (dated 10/04/00) related that the couple had died from stab wounds, noting where they had each been stabbed.

**51.** On October 5, 2000, both papers carried stories about the local arrest of Scotty White, and

subsequent arrests of James DeRosa and John Castleberry, in Corpus Christi, Texas. The articles noted that all three were charged with two counts of first-degree murder. The STR article noted that White met with police on October 4, 2000 and was arrested that morning, that the Plummer pickup was found submerged in Poteau's City Lake later that afternoon, and that the other two defendants were arrested that same evening.

On October 6, 2000, both papers carried articles relating that White had been arraigned in the case, while the other two defendants remained in Texas. The STR article gave further details about the extent of the robbery and the fact that the victims "appeared to have struggled with their attackers, who stabbed them multiple times." The STR article also described, in substantial detail, the various stories that White told to police and noted that the defendants could face the death penalty. A later STR article (dated 10/10/00) described the arraignment of DeRosa and Castleberry the previous day and again noted that, if convicted, the three defendants could receive the death penalty. The article stated that DeRosa had once worked for the Plummers as a ranch hand, and related the story that White ultimately told police about what happened.

**52.** Three of the TW articles stated that Curtis Plummer was known to keep "large amounts of cash" on his person and in his home.

articles also noted the involvement of the Plummers in their church.

¶ 25 Yet not all of the media coverage of the defendants was negative. On October 9, 2000, an article appeared in the Southwest Times entitled, "Community Still Shocked Over Slayings: Family, Friends Say Suspects are 'Typical Young Men,'" which included numerous positive statements about DeRosa.[53] Furthermore, the record contains no evidence of media coverage after October of 2000; and DeRosa does not allege any inappropriate media actions during his trial, in October of 2001.[54]

¶ 26 On June 19, 2001, DeRosa filed a motion to expand voir dire on the issue of pretrial publicity, attaching a detailed public opinion survey about awareness of the Plummer killings, exposure to media coverage of the case, and the nature and strength of public opinion regarding DeRosa's guilt and possible punishments.[55] The survey revealed very high awareness of the case in the community,[56] significant familiarity with DeRosa's alleged involvement,[57] substantial belief of his guilt among those familiar with his involvement,[58] and substantial community feeling that the death penalty was the appropriate penalty for the killing of the Plummers.[59]

53. The article noted that DeRosa's mother was a reserve police officer and described him as "a high school track star," who won the state championship in the 3200 meter run. The minister for DeRosa's church was quoted as saying that when he read about the arrest of "Jimmy," "I thought it must have been another James DeRosa." The minister also related some of DeRosa's family history, including the death of his father. Although the article noted that DeRosa had dropped out of school during his senior year, and quoted an unnamed former employer as saying that Derosa had "left an unhappy marriage and was discharged from the Army" after a brief stint, the same source indicated that he truly believed DeRosa was in the process of changing his life.

54. *Cf. Sheppard,* 384 U.S. at 355, 86 S.Ct. at 1518 ("The fact is that bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom....").

55. The opinion poll was conducted through a telephone survey of 300 potential jurors in LeFlore County, on April 2–5, 2001. It was directed by Dr. Kelly Damphousse, from the Sociology Department at the University of Oklahoma.

56. The survey revealed that almost 86% of those questioned (257/300) were aware of the Plummer killings. When those familiar with the case were asked how they had heard about it, almost 64% (164/257) initially referred to "the media"; and a total of 91% (234/257) reported familiarity with media coverage of the case. Hence only 22% of those surveyed (66/300) reported no exposure to media coverage of the case.

57. When asked to name specific defendants in the case, 38 individuals (nearly 15% of those who had heard of the case) were able to identify DeRosa by name without prompting. When asked whether they recognized DeRosa's name as charged in the case, another 84 individuals responded affirmatively. Hence 47% (122/257) of those familiar with the case could recognize DeRosa's name as charged, though only 41%

(122/300) of the total number surveyed recognized his name.

58. When the 122 persons familiar with DeRosa were asked if they were willing to express an opinion regarding his guilt, 80 individuals (nearly 66%) stated that they believed he was guilty. (Eight expressed a belief that he was not guilty, and 34 declined to express an opinion.) When these persons were asked to rate the strength of their opinion on a scale of 1 to 5—with 5 being "very strong belief," and 4 being "strong belief"—54 persons (68%) rated their opinion of DeRosa's guilt as a "5," and another 19 persons (24%) rated their opinion as a "4." Thus of the persons who expressed a belief that DeRosa was guilty, over 91% (73/80) described their belief as either strongly or very strongly held. Of the total number of persons surveyed, however, only 27% (80/300) articulated a pre-existing belief that DeRosa was guilty.

59. All of the persons surveyed were given the following information about the Plummer killings: "On October 3, 2000, Curtis and Gloria Plummer were found stabbed to death in their home southeast of Poteau." Whether or not they had any prior awareness of the case, all 300 of those surveyed were asked the following question: "What do you think the punishment should be for this offense?". According to a table in the survey, of the 282 persons willing to answer the question, 173 stated that the death penalty was the appropriate penalty; 63 referred to some kind of life sentence; seven stated that either the death penalty or life in prison would be appropriate; and 39 stated that they did not know or listed some other penalty.

Yet the "raw answers" that were provided to support these numbers were incomplete—only 83 answers were listed—and categorizing these answers into the listed categories was not easy. From the specific answers provided, it was impossible to determine whether the surveyor's number totals for the various categories were valid. On the other hand, when the 173 persons

¶ 27 Before voir dire began in DeRosa's trial, the trial court agreed to defense counsel's request for individual voir dire of prospective jurors regarding exposure to media publicity about the case, as well as juror feelings about the three possible punishments. Before any other questioning was allowed, each juror called to the panel was questioned about these issues, one at a time, in front of the trial court bench, outside the hearing of the other prospective jurors, first by the trial court and then by counsel for both sides. Any for-cause challenges on these issues were then immediately resolved, before any general questioning, in open court, was allowed to continue.

¶ 28 A total of fifty-one prospective jurors were questioned, in order to seat the twelve jurors who actually sat on DeRosa's jury.[60] Of those questioned on voir dire, thirty-five (nearly 69%) either knew the victims personally or had heard or read about the case.[61] Of these thirty-five jurors, nine were struck for cause based upon their relationships with the victims and/or familiarity with the facts of the case.[62] And another was struck for cause due to his friendship with the defen-

dant's mother.[63] After voir dire was completed, the trial court denied DeRosa's change of venue motion.

¶ 29 Of the twelve actual jurors, only one had any personal connection to the victims. This juror, John Reed, stated that his parents were friends with the Plummers. Reed also indicated that he knew other members of the Plummer family and that he had read about the crime in both the Southwest Times and the Poteau Daily News. Yet he repeatedly stated that he could be fair and impartial and that he had not formed an opinion about DeRosa's guilt. Defense counsel had ample opportunity to use a peremptory challenge to remove Reed—and never challenged him for cause—but may have chosen to leave him on the jury because Reed indicated that he had gone to high school with DeRosa.[64]

¶ 30 On the other hand, six of DeRosa's twelve actual jurors (including Reed) noted that they had read or seen media coverage about the Plummer killings.[65] Another three expressed that although they had not seen any media coverage, they had heard about the killings through "word of mouth" in the

---

whom the surveyors determined had answered "death penalty" to the original penalty question were further asked whether the death penalty was "the only appropriate punishment" in the case, 112 answered "yes" (65%); 48 answered "no" (28%); and ten indicated they were not sure (6%). Hence among the 300 persons surveyed, 37% (112/300) were willing to express the belief that the death penalty was the "only appropriate penalty" for the killing of Curtis and Gloria Plummer.

60. An additional fifteen panel members were questioned in order to seat two alternate jurors. The entire voir dire lasted one and a half days and covers 550 transcript pages.

61. Of the remaining jurors, twelve had no familiarity with either the victims or the case (24% of those questioned for seats on the actual jury), and four were struck without addressing this issue.

62. Two of these jurors noted that they also knew the defendant and his mother personally.

63. Another nine jurors were struck for bias regarding the penalty phase: two for stating that they were unwilling to consider the death penalty, and the other seven for bias in favor of the death penalty (including two for unwillingness to fully consider the life with parole option). Three

jurors were dismissed for other reasons, and a total of seventeen peremptory challenges were exercised.

64. DeRosa suggests that another juror, Jim Wooten, also had "close ties to the Plummer family." Yet Wooten actually had only a distant connection to the family, i.e., his wife's nephew had married a Plummer granddaughter, but they had been separated for "several years," and Wooten had never even met the Plummers. Wooten also indicated substantial discomfort regarding the death penalty, stating, "I wouldn't want to put him to death, you know" and that he would only consider the death penalty if he "had to." Thus it is unsurprising that defense counsel chose to leave Wooten on the jury.

65. Two jurors indicated that they had seen coverage on television; three read about it in the newspaper; and another saw it on television and also read about it in the paper. Of these jurors, three indicated that they remembered some details from these media accounts. John Reed remembered reading that the Plummers had been found murdered in their home. Cindy Mabry remembered hearing on the news that they had been robbed and shot in their home. Susanne Rogers remembered seeing on TV that "they were at home, it was a break-in; there were three boys involved, basically." The other jurors either did not remember any specifics

community.[66] Only three of the jurors that decided DeRosa's case came into the trial with no prior awareness of the killings of Curtis and Gloria Plummer. Hence 75% of the jurors who actually decided DeRosa's guilt had some prior awareness of the case; and 50% of his jury had been exposed to media coverage of the case.

¶ 31 Nevertheless, DeRosa did not challenge any of the jurors who ultimately decided his case; nor does he now claim that any of these jurors should have been struck for cause.[67] In addition, DeRosa acknowledges that all of the jurors who decided his case stated that they could be impartial and that they would not be affected by anything they had previously seen or heard.

¶ 32 DeRosa has established that there was widespread familiarity with the Plummer killings in LeFlore County, and substantial awareness of his alleged role in these killings. DeRosa has likewise established that this awareness was due, in large part, to media coverage of the killings. Thus the possibility for prejudice on his jury was real and substantial.[68] Nevertheless, the trial court acted reasonably in deferring its decision on his change of venue motion until

after voir dire, particularly where the trial court granted DeRosa's request for individualized voir dire on the issue of bias due to media exposure.[69] Allowing individual voir dire on this issue allowed counsel for both sides to fully investigate what jurors already knew, or had heard or read about the case, without fear of unnecessarily "educating" or influencing other jurors.[70]

¶ 33 Despite the difficulty of selecting an impartial jury under the circumstances of DeRosa's case, this Court concludes that the trial court's decision to allow a thorough and thoughtful voir dire (including individual voir dire about media exposure and penalty bias), along with the trial court's willingness to remove all questionable jurors, adequately met the challenge before the court.[71] Although the potential for prejudice was certainly real, the transcript of voir dire in DeRosa's case, particularly for the jurors who actually decided the case, simply does not support DeRosa's claim that his jury was not adequately impartial and indifferent. Familiarity with a case does not, by itself, disqualify a potential juror from service; and DeRosa fails to establish that the jurors before whom he was tried did not meet the

from their media exposure or were not asked about it.

66. Sharon Lee Southerland stated that she worked at Wal–Mart and had heard some people there talking about it, but that all she heard was that "some people was killed." Terish Ritter stated that she heard from a neighbor that the Plummers had been murdered, but no other details. Kristi Martin stated that she heard that two elderly people were murdered and that "it was just over a few dollars." Martin stated that she had "somewhat" formed an opinion regarding DeRosa's guilt, but clearly indicated that she could set aside what she had heard and be fair and impartial in the case. She was not challenged for cause.

67. DeRosa's only other jury-related claim, Proposition V, relates to the trial court's for-cause removal of a prospective juror for unwillingness to consider the death penalty.

68. Hence the trial court would probably have acted properly if it had chosen to grant DeRosa's change of venue motion—though we do not specifically rule on this issue.

69. This Court has repeatedly condoned the approach taken by the trial court in this case. See, e.g., Hammons v. State, 1977 OK CR 70, 560 P.2d

1024, 1029 (procedure followed by trial court, in taking motion for change of venue under advisement until after extensive voir dire, was "in accordance with that recommended by this Court on numerous occasions") (citations omitted). Where a trial court recognizes potential merit in a defendant's change of venue request, due to prejudicial pretrial publicity or other factors, but believes that it is reasonably likely that a fair and impartial jury can be seated in the county in which the case was filed, deferring decision on the motion until voir dire has actually been completed is a reasonable and prudent approach. See also Bear, 762 P.2d at 953–54.

70. And this Court commends the trial court for its conduct of voir dire in this case.

71. See Bear, 762 P.2d at 954 ("Whether jurors have opinions that disqualify them is plainly one of fact and the resolution of such question is entitled to special deference by a reviewing court.... This is especially true where, as here, that determination is made after an extended voir dire designed specifically to identify biased veniremen ....") (internal citation omitted); id. at 953 (noting that trial court "scrupulously excused those potential jurors who indicated they might not be able to set aside their knowledge or

standard of being, nonetheless, "fair and impartial." [72]

¶ 34 This Court notes that DeRosa is not asserting that any of the proffered newspaper articles contain statements that are false or inflammatory (beyond the appalling facts of the crime itself).[73] DeRosa does not cite even a single media statement as inaccurate, and the newspaper articles from October of 2000 are almost entirely consistent with the evidence put on by the State during DeRosa's trial, one year later. While the articles about DeRosa's escape from jail certainly could have been prejudicial, his short-lived escape was never referenced at trial, and not a single juror mentioned any awareness of the escape during voir dire. Furthermore, while various articles discussed the "confessions" of White, none of them alluded to any confession or inculpatory statement by De-Rosa; and the contents of White's various police interviews were fully explored at trial.

¶ 35 Under these circumstances, this Court concludes that the trial court did not abuse its discretion, either by deferring decision on DeRosa's change of venue motion until the time of trial, or by denying DeRosa's motion after voir dire was completed.[74] DeRosa's jurors stated that they were willing to lay aside any prior knowledge or opinions and render a verdict based upon the evidence

presented in court, and DeRosa has not given this Court any reason to reject these assurances. He fails to show that he was tried by a jury that was biased against him, due to media influence or otherwise. Hence his claim is denied.

■ ¶ 36 In Proposition V, DeRosa claims that the trial court's removal of prospective juror Sherry Ann Stanfill,[75] based upon her reservations about the death penalty, violated *Witherspoon v. Illinois.*[76] In *Witherspoon,* the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."[77] The Court held that it violates due process to exclude otherwise eligible prospective jurors due simply to their opposition to the death penalty.[78]

¶ 37 In *Wainwright v. Witt,*[79] the Supreme Court clarified that the proper standard for assessing whether a prospective juror can be legitimately excluded, based upon his or her views on capital punishment, is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "[80] The *Wainwright* Court also

---

opinion of the crime"); *see also Walker,* 723 P.2d at 278.

72. *See, e.g., Allen,* 862 P.2d at 490 ("Prospective jurors are acceptable even if they have heard about a case through the media and even if they have formed an opinion about the case, provided they are willing and able to set aside their opinions and base their decisions in the case solely on the evidence presented at trial.").

73. *See Murphy,* 421 U.S. at 800 n. 4, 95 S.Ct. at 2036 n. 4 (noting distinction between "largely factual publicity" and "that which is invidious or inflammatory"); *Hain,* 919 P.2d at 1137 (noting that defendant "has not asserted that any articles appearing in the local newspapers were not factual accounts or that they were invidious or inflammatory in nature"); *Braun,* 909 P.2d at 793 (although contents of newspaper articles "may not have been flattering," articles were "factual" and not "invidious or inflammatory in nature").

74. The trial court was not required to grant a pre-trial evidentiary hearing on the motion.

75. Although DeRosa refers to this juror by the last name "Stanfield," the record clearly indicates that her last name is "Stanfill."

76. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

77. *Id.* at 522, 88 S.Ct. at 1777.

78. *Id.* at 522–23, 88 S.Ct. at 1777–78. The Supreme Court has also recognized that the wrongful exclusion of an eligible juror in a capital case, based solely upon that juror's opposition to the death penalty, can never constitute "harmless error." *See Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987).

79. 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

80. *Id.* at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)); *see also Carter v. State,* 1994 OK CR 49, 879 P.2d 1234, 1243–44 (quoting *Wainwright* ), *cert. denied,* 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995).

recognized that this standard "does not require that a juror's bias be proved with 'unmistakable clarity,'" and that "deference must be paid to the trial judge who sees and hears the juror." [81]

¶ 38 Prospective juror Stanfill was equivocal in her responses to questions about whether she could consider the death penalty as a sentencing option. Early in her questioning, she indicated that she would have a preconceived notion that one of the three sentencing options was "ordinarily or always" the appropriate sentence for first-degree murder. She stated that she could consider all three sentencing options, but later acknowledged that she would have a "hard time" with the death penalty. When the court then asked her if she could vote for the death penalty if the State proved the aggravating circumstances alleged and also that the death penalty was "the only appropriate sentence" in the case, Stanfill responded, "I don't think I would be able to."

¶ 39 On a follow-up question by defense counsel, Stanfill reversed herself and indicated that she could consider the death penalty in the case at issue. She also indicated that she could conceive of a set of facts where she could vote to impose the death penalty. The trial court then intervened to ask Stanfill a final question:

> If you found beyond a reasonable doubt that the defendant was guilty of one or— one of these murders, and you found also the State proved beyond a reasonable doubt that one or more aggravating circumstances existed, and the State also proved beyond a reasonable doubt that the death penalty was the only appropriate sentence, could you vote for the death penalty?

Stanfill responded, "To be honest, no." The trial court then excused Stanfill, over defense objection.

¶ 40 Stanfill was certainly equivocal regarding her ability to consider the death penalty as a sentencing option. [82] Nevertheless, her final answer made clear that she did not believe that she could honestly consider sentencing DeRosa to death, even if the State proved that death was the "only appropriate sentence in the case." The trial court was able to directly observe and evaluate Stanfill, and the court's decision to remove her from the jury, for her admitted inability to fairly consider all three penalty options, was reasonable and justified. The trial court did not violate *Witherspoon* by striking Stanfill.

## ISSUES RELATING TO THE GUILT STAGE OF TRIAL

¶ 41 In Proposition I, DeRosa argues that the trial court erred in failing to grant his request for a mistrial, after the prosecutor accused defense counsel of lying. DeRosa argues that the prosecutor essentially called his counsel a "liar" and that the trial court's admonishment to the jury to disregard the remark, in addition to sustaining defense counsel's objection to it, was insufficient to resolve the prejudicial effect of the attack on his counsel's credibility.

¶ 42 The challenged remark, which was actually a question, must be understood within the context in which it arose. Daniel Wilson, who shared a cell with DeRosa in the LeFlore County Jail during October of 2000, testified for the State as a "jailhouse informant." [83] He testified that although DeRosa did not initially talk about what he had done, he eventually "started coming out with more and more of it," to both Wilson and another cellmate.

¶ 43 Most of the story that Wilson ascribed to DeRosa was consistent with the testimony of Castleberry and White. [84] According to

81. 469 U.S. at 424–26, 105 S.Ct. at 852–53.

82. The *Wainwright* Court recognized the difficulty of assessing jurors like Stanfill, noting that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakeably clear.'" 469 U.S. at 424–25, 105 S.Ct. at 852. The Court explained that this is the reason "why deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426, 105 S.Ct. at 853.

83. On cross-examination, Wilson testified that he and DeRosa shared a cell together for part of September of 2000, though DeRosa was not even arrested until October 4, 2000.

84. On appeal, DeRosa correctly points out that parts of Wilson's account are inconsistent with other evidence presented at trial. For example, Wilson's story describes DeRosa as hanging back, while Castleberry initially went to the

this story, DeRosa planned the crime, and he and Castleberry entered the home after Mrs. Plummer came to the door. After they were inside, they began "demanding the money and stuff." DeRosa held a knife to Mr. Plummer, while Castleberry held a knife to Mrs. Plummer. Everything was going according to plan, until Mrs. Plummer "started rebelling" and "fighting back." Castleberry then started stabbing her; and when Mr. Plummer tried to come forward and help his wife, DeRosa "went ahead and done what he had to do." [85]

¶ 44 Defense counsel attempted to establish that Wilson had agreed to testify, and had probably "enhanced" his testimony, in order to obtain a favorable plea bargain on numerous charges he had previously been facing.[86] Wilson testified that he had not been given and did not expect to receive any special treatment in his own cases, based upon either the information he provided or

his testimony against DeRosa.[87] In fact, Wilson maintained that he first contacted law enforcement about DeRosa on January 22, 2001, the very day that he entered a plea bargain resolving his three different cases.

¶ 45 On this date Wilson did resolve his three cases in a very favorable manner.[88] Wilson testified that as he sat in the hallway of the LeFlore County Courthouse, after entering his pleas, he saw Shawn Ward walking down the hall and told Ward that he might have "something that could help" in DeRosa's case and that he knew where the knives were. Ward, who was the main investigator in the Plummer case, had previously been a police officer and knew Wilson from arresting him in the past. According to Wilson, Ward asked him why he was in the courthouse and the status of his cases, but did not pursue his offer of information or set up any further meeting.[89] Wilson testified that he did not have any further contact with Ward

---

Plummers' door alone; names Castleberry, instead of DeRosa, as the person who initially stabbed Mrs. Plummer; and refers to both men taking a "shower" afterward. Defense counsel was free to point out these inconsistencies at trial.

85. Wilson testified that DeRosa told him that after they killed the Plummers and stole their truck, they met Scotty White and put the truck in the water. Wilson described DeRosa as "real cocky" that no one was going to find any evidence, because they had taken the knives, one of which was a "fold-up knife" and the other of which was a "regular straight knife," put them in a sock, and thrown them into the water, off to the side of the truck. According to Wilson, DeRosa stated that they ate at Taco Bell afterwards, with money taken from the Plummers, and that "everything went perfect" until White came forward.

86. The exhibits entered into evidence at trial indicate that Wilson had previously been facing charges in three separate LeFlore County cases. In CF–2000–147, he was charged with one count of Larceny of a Motor Vehicle, as well as four other counts. Although the original information is not included in the record, Wilson admitted at trial that the four other counts were two counts of Assault and Battery with a Dangerous Weapon, one count of First–Degree Burglary, and one count of Kidnapping. In CF–2000–331, Wilson was charged with one count of Feloniously Pointing a Firearm. In CF–2000–385, Wilson was charged with a felony count of Running a Road Block, as well as four misdemeanor counts (Eluding a Police Officer, Driving Without a

Driver's License, False Report of Theft of a Vehicle, and Obstructing an Officer). A "second page," alleging a prior felony conviction for Escape From County Jail, was filed in all three cases. It should be noted, however, that the sole felony count in CF–2000–385 was dismissed at the preliminary hearing in that case, on October 3, 2000—before DeRosa was even arrested. Hence only four misdemeanor counts were at issue in that case.

87. Wilson's testimony about why he decided to come forward and testify against DeRosa is addressed within the discussion of Proposition IV *infra*.

88. Exhibits admitted into evidence at trial indicate that on January 22, 2001, Wilson pled guilty to Larceny of a Motor Vehicle, in CF–2000–147, and Feloniously Pointing a Firearm, in CF–2000–331. The four other counts in CF–2000–147 were dismissed; the "second page" was dismissed in both cases; and CF–2000–385, with its four remaining misdemeanor counts, was dismissed entirely. Pursuant to the plea bargain resolving these cases, Wilson was sentenced, on the two counts upon which he was convicted, to seven years imprisonment, with the first two in DOC custody and the other five suspended, to be run concurrently. Wilson testified at DeRosa's trial that he believed he had "about fifty-something days" remaining on his incarceration at that time.

89. On re-direct examination, Wilson testified that the written plea agreement, summarizing the deal he had obtained, was completed and signed before he ever saw Ward that January afternoon.

until he wrote him a letter, from the Lawton Correctional Facility, on June 14, 2001.[90]

¶ 46 Defense counsel cross-examined Wilson vigorously, and often sarcastically, about the numerous serious charges he was facing before his plea bargain; the things he had been accused of doing; the possible lengthy sentences on those charges, particularly in light of his prior conviction; other prior convictions and the effects of drug usage;[91] the fact that Wilson was represented by the same attorneys who represented Scotty White; the fact that the prosecutor who dismissed the various charges against him was also one of the prosecutors in DeRosa's case; and the fact that Wilson's ultimate sentence was only seven years, with only two in actual custody. Defense counsel openly mocked Wilson's claim that his favorable plea deal was unrelated to his current testimony.[92] He also suggested that Wilson's request for "dates," in his letter to Ward, was part of a State effort to help Wilson craft his testimony against DeRosa.

¶ 47 After the lengthy testimony of Wilson was completed, the State called Shawn Ward to the stand. After going through his background and qualifications, the district attorney asked, "How often do you commit conspiracies to get people thrown in the penitentiary?". Defense counsel immediately objected; and at the bench conference that followed, the district attorney defended his question by asserting that defense counsel had spent "the last half hour" suggesting that there was a conspiracy between his office and Daniel Wilson.[93] The court ultimately found that the State was entitled to put on evidence to rebut the defense inference that there was a plea agreement, but that the word "conspiracy" was too argumentative.

¶ 48 Ward then testified about the circumstances surrounding his conversation with Daniel Wilson on January 22, 2001.[94] Ward flatly denied that he intervened in any way to influence Wilson's plea bargain or his sentence. Ward noted that he saw Wilson in the courtroom hallway again some time later, on the day Wilson was there for sentencing. Ward testified that Wilson said DeRosa was being "very open with him," but that Wilson wanted Ward to find out the date that another inmate left the LeFlore County Jail, and that the "dates" mentioned in Wilson's letter was really just a reference to this request.[95]

¶ 49 The district attorney's questioning of Ward that immediately followed is the subject of DeRosa's claim on appeal.

Q. So this letter that you got from him refers to dates was where you provided the specific dates of this crime so Daniel could make up his story?

A. No.

Q. In fact, the date was the day that Glover Green left for LARC?

A. That's exactly the date I provided him.

Q. So the questions we heard Mr. Rowan ask a while ago are not true?

A. No, sir; they are not.

Q. So it's a good questions [sic] who's lying in that—

At that point defense counsel objected, sought a bench conference, and moved for a mistrial. The trial court, without a bench conference, immediately sustained the objec-

---

**90.** In the letter, which was admitted as an exhibit at trial, Wilson wrote that he was contacting Ward because he had not heard from him and that he was still available to help if they needed him. The letter also stated, "I still need those dates before I could sit down and state all that right." The letter noted that Wilson had about six months left on his sentence.

**91.** Wilson admitted to drug convictions in California and Arkansas during his testimony.

**92.** Defense counsel asked, "And we're to have it—to understand that you have no deals in this case at all, right?". He also chided that Wilson must have "the world's best attorney."

**93.** Defense counsel responded to the district attorney's assertion that he had implied there was

a conspiracy, saying, "Well, I didn't say it though." A heated exchange between the two attorneys followed, in which the court had to remind them to address the court and not each other.

**94.** Ward testified that he did talk to Wilson that afternoon and that Wilson said he was in court settling some charges. Ward testified that although Wilson claimed to have information regarding DeRosa, Ward told him that he did not want to talk to him until Wilson had settled his own cases.

**95.** Ward testified that Wilson told him that DeRosa did not start opening up until after inmate J.R. Green was gone. Wilson had earlier testified that DeRosa was afraid of Green.

tion and admonished the jury "to disregard the last statement by the D.A." The court then overruled the defense motion for a mistrial.

¶ 50 DeRosa acknowledges the general rule in Oklahoma that a jury admonishment to disregard a prejudicial remark cures any error. DeRosa correctly notes, however, that comments by a prosecutor that are "unusually egregious" and "so prejudicial that they would undoubtedly taint the verdict" are an exception to this general rule.[96] In such cases, even an admonishment by the trial court could be inadequate to cure the error, and a defendant could be entitled to relief on appeal. In order to determine whether an improper remark or improper testimony rises to this level of prejudice, this Court must evaluate both the improper statement(s) and the evidence presented in the case as a whole.[97]

¶ 51 The State's arguments, (1) that the district attorney did not "even present[ ] a complete thought," because the challenged question was interrupted by an objection, and (2) that the district attorney "did not directly call defense counsel a 'liar,' " are not well-taken. While it may be strange to refer to a question as "not true" or to suggest that a person is "lying" due to the way that he or she is asking questions, the clear import of the district attorney's questions was to accuse defense counsel of lying; and DeRosa's jury would have understood this. As such, the district attorney's behavior was clearly

improper.[98] The prosecutor was entitled to rebut the inference that Wilson's testimony had been influenced by a "secret deal" with the State and to suggest that the jury should not be misled in this regard. He should not, however, have resorted to a personal attack on defense counsel.[99]

¶ 52 Nevertheless, this Court is confident that the district attorney's remarks did not influence or taint the verdict in this case.[100] Despite defense counsel's suggestions to the contrary, Daniel Wilson's testimony was not critical, or even particularly significant, to the State's case against DeRosa. The core of the State's case was the testimony of the two men with whom DeRosa plotted and accomplished the robbery/murder of Curtis and Gloria Plummer, i.e., Eric Castleberry and Scotty White. The compelling testimony of these men was fundamentally consistent and was corroborated by the physical evidence. DeRosa's conviction was further supported by the testimony of other persons to whom he had made incriminating statements, including Daniel Wilson.[101] Yet even if Wilson's testimony were entirely eliminated from DeRosa's trial, this Court has no doubt that the result of the trial, both the convictions and the death sentences, would have been the same. DeRosa has not shown that his right to due process, or any other constitutional right, was prejudiced by the district attorney's remarks. Hence his claim is rejected in its entirety.

96. See Ybarra v. State, 1987 OK CR 31, 733 P.2d 1342, 1347 ("Unless comments by the prosecutor are unusually egregious, admonition of the jury will suffice to cure error."); Harris v. State, 2000 OK CR 20, 13 P.3d 489, 500 ("[A]n admonishment to the jury is presumed to 'cure' most errors, unless the error was so prejudicial that the error undoubtedly would taint the verdict.") (quoting Koehler v. State, 1986 OK CR 110, 721 P.2d 426, 427).

97. See Al–Mosawi v. State, 1996 OK CR 59, 929 P.2d 270, 284 ("A trial court's admonition to the jury to disregard the remarks of counsel or a witness usually cures any error[,] unless it is of such nature, after considering the evidence, that the error appears to have determined the verdict."), cert. denied, 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997).

98. See McCarty v. State, 1988 OK CR 271, 765 P.2d 1215, 1220–21 (noting impropriety of prosecutor's attack on credibility of defense counsel);

Stout v. State, 1984 OK CR 94, 693 P.2d 617, 627 (noting Court's disapproval of prosecutor's attack on credibility of defense counsel).

99. This Court recognizes that previous and subsequent remarks by defense counsel also crossed the line of appropriate representation, but such remarks did not justify corresponding inappropriate behavior on the part of the State. This Court likewise rejects the State's argument that by asserting a particular theory or defense, "defense counsel put his own credibility at issue."

100. See Mooney v. State, 1999 OK CR 34, 990 P.2d 875, 887–88 (prosecutor's reference to defendant as a "liar" was adequately cured by admonishment to jury to disregard the remark).

101. These persons include Chris Ford, Officer David Leal, Justin Wingo, and Daniel Wilson.

■ ¶ 53 In Proposition IV, DeRosa claims that the combined effect of prejudicial witness testimony and prosecutorial misconduct violated both his right to due process and his Eighth Amendment right to a reliable sentencing. Regarding the due process claim, the question is whether improper testimony and prosecutorial misconduct so infected DeRosa's trial that it was rendered fundamentally unfair, such that the jury's verdicts should not be relied upon.[102] Such claims must be evaluated within the context of the entire trial, considering not only the propriety of prosecutorial actions and witness testimony, but also the strength of the evidence against the defendant and the behavior of defense counsel.[103]

■ ¶ 54 DeRosa challenges two particular statements by State witnesses, one by Janet Tolbert, the other by Daniel Wilson. Janet Tolbert, the daughter of Curtis and Gloria Plummer, testified during both stages of DeRosa's trial. During the guilt stage, the State was attempting to establish Tolbert's familiarity with DeRosa, when the following exchange occurred:

Q. Do you see the James DeRosa who worked for you and your parents during that time period in the courtroom today?

A. Oh, yes.

Q. Could you point to him and describe how he appears to you today?

A. You really don't want me to say that, and I'd be thrown out of here. I'm sorry.

In a bench conference immediately following the remark, defense counsel argued that the State should have prevented Tolbert's remark and sought a mistrial. The court overruled the motion and directed the State to ask Tolbert to identify the defendant by simply pointing at him.

¶ 55 DeRosa argues that the trial court "should *at least* have sustained Appellant's objection and admonished the jury to disregard Tolbert's uncalled for comment." DeRosa did not, however, actually object to Tolbert's testimony or ask for such an admonishment, which, based upon the rest of the trial, would certainly have been given if it had been requested. This Court finds that although Tolbert's comment was improper, the record does not suggest that the State could have anticipated her response; nor does it suggest that the comment was so prejudicial that it contributed to DeRosa's convictions or his sentences.[104]

■ ¶ 56 DeRosa also challenges a comment from jailhouse informant Daniel Wilson. When asked by one of the prosecutors why he decided to come forward in the case, Wilson answered as follows:

Well, I've been—I'm no saint. I've done my things in my past and all that, and I've been locked up [in] this cell right upstairs—the hard cell, they call it, where they hold the more serious criminals or, you know, higher risk ones—and been in there with several murderers—been in prison with several murderers. I ain't never been around one like Mr. DeRosa, cold-blooded killer. He thinks it's funny.

Defense counsel's objection and motion for a mistrial based on this remark were overruled; and the district attorney quoted the "cold-blooded killer" description of DeRosa during his closing argument.

¶ 57 Although DeRosa obviously did not like the "cold-blooded killer" comment, the basis for his claim that the testimony was improper is unclear. The prosecutor's question was proper, since Wilson's motivation for coming forward and testifying was the main basis of defense counsel's attack on his credi-

102. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974) (consider whether challenged conduct made trial "so fundamentally unfair as to deny [defendant] due process"); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) ("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' ") (quoting *DeChristoforo* ).

103. *See DeChristoforo*, 416 U.S. at 639, 94 S.Ct. at 1869 (reviewing court evaluates "whether [prosecutor's] remarks, in the context of the entire trial, were sufficiently prejudicial to violate [the defendant's] due process rights"); *Darden*, 477 U.S. at 179, 106 S.Ct. at 2470 ("The prosecutor's comments must be evaluated in light of the defense argument that preceded it. . . . ").

104. *See Al–Mosawi v. State*, 929 P.2d at 284.

bility; and Wilson's answer, though unfavorable to DeRosa, was plausible and not unduly prejudicial.[105] Defense counsel was free to attack the believability of Wilson's story and his claimed intentions, and he did so forcefully. Yet the trial court's ruling regarding the testimony was legally correct, and the State was entitled to invoke the testimony in the manner that it did.

¶ 58 In addition to challenging the quoted testimony of Tolbert and Wilson, DeRosa cites the following as examples of prosecutorial misconduct during his trial: (1) the district attorney's repeated references to the victims as "Papa" and "Mama Glo"; (2) the presentation of testimony indicating that part of the motive for the robbery was that Curtis Plummer was known to carry large amounts of cash; (3) the district attorney's characterization of Castleberry's confession to police; (4) remarks about the testimony and motives of Scotty White; and (5) offering the district attorney's own credibility as a basis for convicting DeRosa.[106]

 ¶ 59 The district attorney repeatedly referred to the victims as "Papa" and "Mama Glo." [107] Defense counsel objected to the use of these terms of endearment during the testimony of the State's first witness, Roger Murray (the ranch hand who discovered the Plummer bodies).[108] During a bench conference, defense counsel objected to the prose-

cutor's use of the nicknames and asked that the victims be referred to by their actual names. The objection was overruled by the trial court without comment; and the district attorney continued referring to "Papa" and "Mama Glo" throughout his questioning of Murray, as well as during his closing arguments for both stages of DeRosa's trial.[109]

¶ 60 DeRosa characterizes the district attorney's use of these familiar names as an improper attempt to align himself with the victims. DeRosa notes that the district attorney also thanked the jury "on behalf of the victims." [110] This Court finds that the district attorney did improperly seek to align himself with the victims and that the trial court erred by overruling DeRosa's objection to this attempt.[111] We do not conclude, however, that the trial court's ruling amounted to an abuse of discretion or that the prosecutor's actions had any effect upon the verdicts. DeRosa was found guilty and sentenced to death based upon the overwhelming and properly admitted evidence in the case. Within the context of the entire trial, the prosecutor's actions were not so prejudicial that they rendered DeRosa's trial fundamentally unfair or his death sentence unreliable.

 ¶ 61 DeRosa also argues that the State "knowingly presented false or misleading evidence to the jury," referring to the

---

105. In *Darks v. State*, 1998 OK CR 15, 954 P.2d 152, 158, this Court found that certain comments by detectives about the defendant, including describing him as a "cold blooded killer," were not relevant, were unduly prejudicial, and should have been redacted from a videotape admitted into evidence. This analysis, however, should not be interpreted as a ruling that this particular phrase, or any comparable phrase, is always taboo at trial. The propriety of such testimony always depends upon the specific context within which it arises.

106. Within DeRosa's laundry list of alleged prosecutorial misconduct, he re-asserts his allegation regarding calling defense counsel a "liar." This claim was dealt with in Proposition I.

107. The other two prosecutors who participated in the trial referred to the victims by their more formal, given names.

108. Murray referred to Curtis Plummer as "Papa" and referred to Gloria Plummer as "Mama Glo."

109. Gloria Plummer's sister, Jo Milligan, was the only other witness who ever referred to "Papa" and "Mama Glo," and she did so only one time, during the second stage of trial. Milligan also called the victims "Curt" and "Glo." Janet Tolbert, the Plummers' only child, consistently referred to her parents as "mother" and "daddy." Hence the State's argument that the victims were generally referred to as "Papa" and "Mama Glo" is not supported by the record, nor is the argument that the district attorney used these nicknames merely to make its first witness more comfortable, since he began using the familial names in the first lines of his opening statement.

110. During his guilt-stage closing argument, the district attorney stated, "Now, on behalf of the family and the State of Oklahoma, I want to say thank you for your jury service."

111. *See Tobler v. State*, 1984 OK CR 90, 688 P.2d 350, 356. Standing alone, the prosecutor's "thank you" statement was not significant in this regard—nor was it objected to—though it did add to the potential harm from the use of the familial references.

testimony of Chris Ford, Scotty White, and Eric Castleberry that DeRosa told them that Curtis Plummer had paid him in cash and that he had lots of cash and "big bills" in his wallet—which was part of the reason the Plummers were targeted. DeRosa's only basis for characterizing such testimony as "false or misleading" is the fact that the State introduced into evidence two checks written to DeRosa, by Gloria Plummer. These checks, dated 7/15/99 and 7/22/99, establish that *Gloria* Plummer paid DeRosa by check on at least two occasions.[112] They certainly do not establish that *Curtis* Plummer never paid DeRosa in cash, as DeRosa told numerous people he did. Neither the "cash testimony" nor the State's references to it were misleading or improper.[113]

¶ 62 DeRosa also complains about a number of closing-argument prosecutorial remarks, including a particular characterization of Castleberry's confession to police, just after he was arrested. The substance of this confession was brought out through the testimony of Sheriff Kendall Ballew, who arrested Castleberry.[114] During his first-stage closing arguments, the district attorney stated:

> Before [Castleberry] ever had an opportunity to talk to anybody who could have reached a plea agreement with [him], he gave the same core statement [to Ballew] that he testified to. So if his motivation to give that statement is that he's saving his life with a plea agreement, those two things just don't fit. He made that statement because his conscience required him to. He made that statement because he

knew he was had. He made that statement because it was the right thing to do, and he's not going home. He's already pled guilty. He's done the right thing.

DeRosa argues that the prosecutor "went too far with this argument," because by describing Castleberry's actions as "the right thing to do," he was inviting the jury to draw a negative inference about DeRosa's constitutionally-protected decisions to remain silent and go to trial.

¶ 63 Since DeRosa did not object to this remark, all but plain error has been waived.[115] The reference to Castleberry doing "the right thing" came up within a list of reasons that the district attorney offered as possible rationales for his decision to confess. No evidence was offered regarding Castleberry's actual reasons; and the jury would most likely have understood the prosecutor's remarks as merely hypothesizing about why an individual who fled the State, after participating in two murders, would confess a few days later.

¶ 64 Directly contrasting one individual's decision to confess and plead guilty with that of a defendant who chooses to remain silent and go to trial—particularly if the first decision is described as "the right thing to do"—could constitute an undue burdening of a defendant's Fifth and Sixth Amendment rights. That is not, however, what happened in this case.[116] While prosecutors must guard against remarks that could unduly burden a defendant's exercise of constitutional rights, appellate courts must evaluate prosecutorial remarks within the

---

**112.** The memo lines on the two checks read "labor" and "labor + 60 cash," respectively.

**113.** The State correctly notes that even if Curtis Plummer had not actually paid DeRosa in cash, the unchallenged testimony that DeRosa told his intended cohorts that he was paid in cash, and that this was part of the motive for the proposed robbery, would still be relevant and admissible.

**114.** Castleberry had testified earlier in the trial and been cross-examined about the timing of and rationale for his coming forward. Although DeRosa objected to Ballew's confession testimony at trial, he now acknowledges that it was appropriate to allow this testimony, to rebut defense counsel's implied accusation of recent fabrication and/or improper motive.

**115.** *See Banks v. State,* 2002 OK CR 9, 43 P.3d 390, 401, *cert. denied,* 537 U.S. 1126, 123 S.Ct. 898, 154 L.Ed.2d 811 (2003).

**116.** The prosecutor did not suggest that Castleberry's choices should be compared with those of DeRosa in this regard. And the current case is totally unlike *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), in which the trial court instructed the jury that it could infer guilt from the defendant's decision to remain silent, under conditions where it could reasonably be expected that an innocent person would speak up, and in which the prosecutor argued to the jury that it should do so in the case at issue. *Id.* at 609–15, 85 S.Ct. at 1230–33.

specific context within which they arise, and not presume that a prosecutor intends—or that a jury will comprehend—an oblique but inappropriate interpretation, rather than a more direct, lawful one.[117] This Court finds that the district attorney's remarks did not burden DeRosa's exercise of his constitutional rights; nor did the remarks violate due process.

 ¶ 65 DeRosa also challenges certain prosecutorial statements regarding Scotty White. During cross-examination, defense counsel asked White whether he had "a deal," to which White responded, "What do you mean?". White then acknowledged that the original first-degree murder charges against him had been reduced to accessory after the fact, but testified that he had not yet pled guilty and that his attorney was "trying to work a deal" for him. It was clear to everyone at trial that White's assistance and limited involvement in the crime had led to the reduction of his charges and that White was hopeful that his cooperation would be taken into account at his eventual sentencing.

¶ 66 Nevertheless, DeRosa objects to portions of the following remarks, made during the district attorney's first-stage closing arguments.

> And Scotty was the wheel man, and the defense again is going to say that Scotty White was testifying up here because he's scared to death of what kind of deal he's going to get. Well, he doesn't have a deal. The charge is reduced on him to accessory. He was driving the car. He never went in the house. He's going to get what he's going to get. In a few weeks, maybe a jury like you is going to sit here and tell him what he's going to get. But there's no deal. He's facing up to ninety years in the penitentiary, and yet, he testified, and he testified truthfully to the core elements of the case. Mr. Rowan is going to call him a

liar—already has—and he's going to say he took the stand and lied to save his own rear. But the fact is if you look at the statements that Scotty White has given, . . . the core facts about what happened have always been the same.

DeRosa asserts that saying Scotty White "doesn't have a deal" was misleading and amounted to improper bolstering, and also objects to the suggestion that White's charges were reduced because of his limited involvement.[118]

¶ 67 This Court finds nothing improper in the prosecutor's statement that White "doesn't have a deal." The fact that White did not have a plea deal at the time of trial, though he admittedly hoped to make one, was apparently true, and it was appropriate for the prosecutor to note this fact. The suggestion that White's charges were reduced due, at least in part, to his limited involvement was likewise accurate and not misleading. Furthermore, the fact that White had cooperated and was testifying in the hope that it would help reduce his ultimate criminal liability was clear to everyone and was not "obscured" by the prosecutor's remarks. There was no prosecutorial misconduct here.

 ¶ 68 DeRosa also challenges the following statements by the district attorney, as examples of him asserting his own credibility as a basis for convicting DeRosa: (1) that it "offended" him that defense counsel was calling Shawn Ward a "liar"; (2) that "I promise you one thing: We've got more than enough to do up here than sit around and trump up cases against people in the community"; and (3) that defense counsel's attack on Daniel Wilson's credibility was "a common defense tool" to put everyone on trial but the defendant. All of these remarks were in response to defense counsel's suggestion that Wilson had a "secret deal" with the State, which

---

**117.** *See DeChristoforo,* 416 U.S. at 647, 94 S.Ct. at 1873 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."). While the suggestion that the prosecutor's remarks served as an indirect criticism of DeRosa's failure to confess and plead guilty is interesting and thought-provoking, this

interpretation is not the most natural one—which probably explains why no one on DeRosa's defense team, which included current appellate counsel, objected at the time.

**118.** DeRosa states in his brief that the argument about the reduction in White's charges "is at least potentially misleading, in light of the fact that White was, by his own testimony, a principal to the charged crimes, not merely an accessory."

Ward was dishonestly denying,[119] and the broader defense theme that the case against DeRosa was based not on actual guilt, but on the State's desire to "get him," through the bartered testimony of its witnesses.

¶ 69 Defense counsel objected to the remark about Shawn Ward on the ground that he had not actually called the various witnesses "liars."[120] We find that any inappropriate suggestion within the remark—such as the prosecutor's personal belief in Ward's credibility—was minimal, and that the remark did not affect the verdicts in DeRosa's case. Objections to the second two statements were sustained, and the jury was admonished to disregard them. DeRosa argues that despite these admonishments, these remarks help establish "a pattern of prosecutorial misconduct that infected appellant's trial with unfairness." DeRosa further argues that even if improper witness testimony and prosecutorial remarks did not affect the guilt-stage verdicts in his trial, they could have affected the jury's decision to sentence him to death.[121]

¶ 70 This Court has recognized a number of instances of prosecutorial misconduct during DeRosa's trial—including suggesting that defense counsel was "lying" and inappropriately attempting to align the State with the victims—and found that a particular state-ment by witness Janet Tolbert was improper.[122] This Court notes that even though some of the district attorney's remarks crossed the line of appropriate representation, many of these remarks were in direct response to defense counsel's own overzealous arguments.[123] Ultimately, DeRosa has failed to show either that his trial was so infected by misconduct and unfair testimony as to violate due process, or that his death sentences were obtained through a violation of the Eighth Amendment. DeRosa was convicted and sentenced to death based upon the facts of his crime and the aggravating circumstances in the case, rather than any improper remarks by the district attorney or State witnesses. Hence the current claim is rejected.

¶ 71 In Proposition VI, DeRosa challenges the trial court's decision to admit two particular photographs into evidence at trial.[124] These photographs, State's Exhibit No. 44 and State's Exhibit No. 49, are close-up pictures of the wounds to the necks of Curtis Plummer and Gloria Plummer, respectively. DeRosa acknowledges that the trial court did not admit any autopsy photographs and that it excluded a particularly gruesome photograph of the wound to the right side of Mrs. Plummer's neck.[125] Nevertheless, De-

---

119. This issue was addressed in detail within Proposition I.

120. Not surprisingly, this objection was overruled.

121. DeRosa's only specific complaints regarding the second stage of his trial are the district attorney's reference to Dr. Wanda Draper's "career as a professional witness," and his continuing use of the terms "Papa" and "Mama Glo." The trial court sustained defense counsel's objection to the "professional witness" comment and admonished the jury to disregard it.

122. In making its ultimate evaluation of the fundamental fairness of DeRosa's trial, this Court has considered all of these circumstances, including the prosecutorial remarks to which objections were sustained and about which the jury was admonished.

123. *See Darden*, 477 U.S. at 182, 106 S.Ct. at 2472 (noting that "[m]uch of the objectionable content" within the prosecutor's argument "was invited by or was responsive to" defense counsel's earlier argument).

124. Defense counsel objected to the photographs at trial.

125. The photograph of Gloria Plummer's neck area that was admitted into evidence depicts the front side of her neck and clearly shows the wound directly beneath her chin. The excluded photograph, which appears in the record, depicts the right side of her neck, as well as the bottom portion of her face. This photograph, unlike the admitted photograph, shows the extent of the injury to the right side of her neck. Appellate counsel now argues that there is no discernible difference in the potential prejudice from the two photographs. This argument is not well taken.

Lead defense counsel at trial described the excluded picture as "the single worst photograph I've ever seen in my over thirty years as a lawyer in murder cases." The trial court ultimately agreed and commented, "in almost twenty-five years of trying cases, I've never seen a crime scene photograph quite as graphic as this one." The court worried that the jury "would have a visceral, physical reaction" to the photograph, and ultimately excluded it on this basis.

The Court has viewed the photographs, and the excluded photograph is indeed substantially more disturbing and potentially prejudicial than the admitted photographs. We commend the trial court for its judgment in choosing not to

Rosa argues that State's Exhibits 44 and 49 were substantially more prejudicial than probative and that their admission violated his rights to due process and a reliable sentencing.

¶ 72 DeRosa notes that the investigator who took the photographs testified about the victims' wounds and that the medical examiner provided both diagrams and testimony about the location, nature, and extent of their injuries. Yet such evidence is necessarily limited in its ability to convey to the jury the actual appearance of the victims' injuries. The two photographs were the only admitted pictures of each of these injuries, and they do not show more of the victim than is necessary to portray their wounds.[126] Hence these photographs fairly depict their probative content, i.e., the injury itself, while minimizing their inappropriately or "unduly" prejudicial effect.[127]

¶ 73 This Court recognizes that the challenged photographs are indeed disturbing and even gruesome. They do not, however, depict the work of a medical examiner, as an autopsy photograph might, or the effect of the natural decomposition process, as in cases where a body is discovered long after the actual killing. These pictures depict the handiwork of James DeRosa and his recruited cohort, Eric Castleberry, and it did not violate due process or the Eighth Amendment to show them to DeRosa's jury. The trial court did not abuse its discretion in admitting the photographs.

### ISSUES RELATING TO THE SENTENCING STAGE OF TRIAL

¶ 74 In Proposition II, DeRosa raises three challenges relating to victim impact evidence: (1) the victim impact testimony in his case was too emotional; (2) the victim impact

subject the jury to this photograph, which, though it may have been admissible, was certainly unnecessary to DeRosa's trial.

126. In particular, they do not show a substantial portion of the faces of the victims.

127. "This Court has consistently held the test for admissibility of a photograph is not whether it is gruesome or inflammatory, but whether its probative value is substantially outweighed by the danger of unfair prejudice." Bernay v. State, 1999 OK CR 37, 989 P.2d 998, 1007 (emphasis

evidence in his case contained inappropriate characterizations of his crime and an improper recommendation regarding his sentence; and (3) victim impact evidence in general is unconstitutional and has no appropriate role within Oklahoma's capital sentencing scheme. DeRosa argues that the use of victim impact evidence in his case was unconstitutional and requires that this Court vacate his death sentences.

 ¶ 75 The State argues that DeRosa did not adequately preserve all of his current challenges. On October 17, 2001, defense counsel filed a motion raising numerous objections to the proposed victim impact evidence, including all of DeRosa's current claims. The jury returned its guilt-stage verdicts on October 18, 2001. Immediately thereafter, the trial court took a recess, in order to consider DeRosa's victim-impact objections. Within the in-camera hearing that followed, DeRosa failed to specifically raise some of his current challenges.[128] Yet the transcript of the hearing makes clear that the trial court had before it DeRosa's written objections (filed one day earlier) and that the court was ruling on all of these objections, not merely those that were re-raised orally that day. Hence the current challenges were properly preserved at the trial level.

 ¶ 76 Ultimately, the trial court rejected two of the proposed victim impact witnesses and ordered specific redactments from the statements of the other two witnesses.[129] The court then overruled all of DeRosa's other challenges. The victim impact testimony of Janet Tolbert (daughter of the victims) and Jo Milligan (sister of Gloria Plummer) was the only new evidence put on by the State during the sentencing stage of DeRosa's trial.[130]

added) (citing cases), cert. denied, 531 U.S. 834, 121 S.Ct. 92, 148 L.Ed.2d 52 (2000).

128. DeRosa did specifically challenge Janet Tolbert's recommendation that he be sentenced to death, both under general constitutional principles and because it was overly "amplified."

129. The court ruled that two granddaughters of the victims would not be allowed to testify, since they were not members of the victims' "immediate family," under 22 O.S.Supp.2000, § 984(2).

130. Defense counsel did not object to the testimony of these women when they were sworn in

¶ 77 DeRosa argues that the victim impact testimony of Tolbert and Milligan amounted to a "hyper-emotional plea for revenge" and focused too much on the emotional impact of the murders. The governing Oklahoma statute defines "victim impact" evidence as follows: "information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, ... circumstances surrounding the crime, the manner in which it was perpetrated, and the victim's opinion of a recommended sentence." [131] This Court has recognized that victim impact testimony should generally be restricted to these issues, though it can also be used to give the jury "a quick glimpse" of the life of the victim, to demonstrate "those unique characteristics which define the individual who has died," and to show "why the victim should not have been killed." [132]

¶ 78 While a substantial portion of the victim impact testimony of Tolbert and Milligan did address the emotional and psychological toll that the Plummer murders caused in their lives, their testimony was not exclusively emotional. Tolbert testified that the murder of her parents caused her to have sleepless nights, nightmares, and post-traumatic stress disorder. Milligan testified that the murders caused her "many sleepless nights, nightmares, acid reflux and upset stomach, post-traumatic stress disorder and all of its components, such as memory loss, depres-

sion, tears—oh, so many tears—anger, and physical pain in my heart." Milligan also noted that the loss of her sister left her without someone to consult with about "what to do about our mother."

¶ 79 Both women, who lived near the Plummer home, mentioned that they had interacted with Curtis and Gloria Plummer on a daily basis and now could no longer do so. In addition, both women offered a "quick glimpse" into the lives and character traits of the Plummers.[133] This Court finds that the testimony of Tolbert and Milligan did not go beyond the bounds of acceptable victim impact testimony in this regard, and rejects DeRosa's first challenge to it.

¶ 80 DeRosa also argues that the victim impact evidence presented during his trial contained inappropriate characterizations of his crime and an improper recommendation regarding his sentence. He makes a general challenge to this evidence, as well as a challenge to the particular evidence presented in his case.

¶ 81 DeRosa first asserts that this Court has erroneously interpreted the Supreme Court's decision in *Payne v. Tennessee*,[134] to allow for victim recommendations regarding the defendant's sentence, as well as victim characterizations of the crime. This Court has recently noted that although the Supreme Court had earlier forbidden such evidence, the decision in *Payne* left open the question of the validity of such evidence.[135]

as witnesses; nor did defense counsel orally reassert his various challenges during their testimony. Hence the State again asserts waiver. The trial transcripts reveal that the trial court was well aware of the various victim-impact objections being raised by DeRosa, that it had ample opportunity to consider these challenges, and that the court nonetheless rejected them. To find that DeRosa "waived" any of his current challenges, simply because he did not pester the trial court with each and every one of them, at every opportunity, would be to engage in pointless formalism. Such a requirement would only prolong and further complicate capital trials, without corresponding benefit. We decline the State's invitation to avoid the merits of DeRosa's claims.

**131.** *See* 22 O.S.Supp.2000, § 984(1).

**132.** *See, e.g., Cargle v. State,* 1995 OK CR 77, 909 P.2d 806, 828, *cert. denied,* 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996); *Ledbetter v. State,* 1997 OK CR 5, 933 P.2d 880, 890; *see also*

*Payne v. Tennessee,* 501 U.S. 808, 822–25, 111 S.Ct. 2597, 2606–08, 115 L.Ed.2d 720 (1991).

**133.** Tolbert noted that they were "good, hardworking people" and had "helped a lot of people in this county." Milligan testified that they were "wonderful people" who "helped so many people," had many friends, "loved their family," and "loved life."

**134.** 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

**135.** *See Murphy v. State,* 2002 OK CR 24, 47 P.3d 876, 885 (noting that *Payne* opinion explicitly "left open the question about admissibility of victim impact evidence regarding characterizations and opinions about the crime, the defendant, and the appropriate sentence"); *see also Payne,* 501 U.S. at 830 n. 2, 111 S.Ct. at 2611 n. 2 (recognizing that although *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), held that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appro-

The legislature of this State has specifically provided for the admission of this kind of victim impact evidence.[136] And this Court has rejected claims like DeRosa's in the past.[137] The Court will not re-examine the issue here.

¶ 82 Regarding the specific testimony presented during his trial, DeRosa argues that the testimony of Tolbert and Milligan exceeded the bounds of an appropriate sentencing recommendation and contained improper characterizations of his crime.[138] This Court has reviewed all of the victim impact testimony and finds that the testimony did go too far, particularly in terms of Tolbert's emotional plea for the death penalty and Milligan's speculative and inflammatory claims about the victims' experience of their attack.[139] Nevertheless, the testimony was not

"so unduly prejudicial" that it rendered DeRosa's trial "fundamentally unfair" or his sentencing "unreliable."[140] This Court rejects DeRosa's specific challenges to the testimony of Tolbert and Milligan, as well as his claim that the overall effect of their victim impact testimony created an unconstitutional risk that his jury would be unable to make a reliable sentencing determination in his case.[141]

¶ 83 Finally, DeRosa argues that victim impact evidence "operates as an irrelevant, improper, nonstatutory, 'superaggravator' that will always be present in every capital case." This claim has been raised repeatedly and unsuccessfully in the past.[142] We need not rehash the issue here, especially since DeRosa's jury was properly instructed on the proper and limited role of victim impact evidence.[143] We rely on our earlier decisions

priate sentence" violated the Eighth Amendment, the Court's ruling in *Payne* was "limited" to its conclusions about the admissibility of evidence about the victim and the effect of the victim's death on the family, since other types of victim impact evidence were not at issue in *Payne*).

**136.** *See* 22 O.S.Supp.2000, § 984(1) (quoted *supra* in text).

**137.** *See, e.g., Murphy,* 47 P.3d at 885; *Willingham v. State,* 1997 OK CR 62, 947 P.2d 1074, 1086, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998), *overruled in part by Shrum v. State,* 1999 OK CR 41, 991 P.2d 1032, 1036; *Conover v. State,* 1997 OK CR 6, 933 P.2d 904, 920; *Ledbetter v. State,* 933 P.2d at 890–91.

**138.** Tolbert recommended that the jury sentence DeRosa to death, saying, "I ask you, the jury, for justice. Although this will not bring them back to us, it will give us some peace of mind. Our family has suffered enough because of this man. My family pleads with you to give the death penalty." Although Milligan did not provide a sentencing recommendation, she did provide a number of characterizations of the crime. In particular, she referred to "the horrible, heinous way in which they died" and that Gloria Plummer "suffered pain and terror in her last moments" and that she "felt horror and betrayal from people that they knew and trusted." Milligan also referred to the Plummers as "helpless, knowing they were going to die...."

**139.** *See Ledbetter,* 933 P.2d at 891 ("Any opinion as to the recommended sentence should be given as a straightforward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification."); *Washington v. State,* 1999 OK CR 22, 989 P.2d 960, 978–79 ("recommendations on punishment should be concise statements ... without amplification");

*Conover,* 933 P.2d at 920 ("inflammatory descriptions designed to invoke an emotional response," about the way in which a murder was committed, "have no place in a victim impact statement"); *Willingham,* 947 P.2d at 1086 ("comments by the victim's family ... on the manner in which the crime was perpetrated .... have no place in a 'victim impact statement' ").

**140.** *See Payne,* 501 U.S. at 825, 827, 111 S.Ct. at 2608, 2609; *Cargle,* 909 P.2d at 826.

**141.** The victim impact statements in this case raise very serious questions, particularly Tolbert's sentencing recommendation, which violates our clearly established caselaw regarding the authorized "concise" and "unamplified" format for such recommendations. Nevertheless, this was a premeditated, gruesome, heinous crime against two innocent victims, and the rest of the trial was remarkably error free. There is no real doubt about DeRosa's guilt. Similarly, there is virtually no doubt that the jury in this case would have imposed two death sentences even without the erroneous victim impact testimony. Although I personally have qualms about whether we should ever substitute our judgment for that of a jury, I recognize that this Court has applied a harmless error analysis in this context before, *see Cargle,* 909 P.2d at 835, and I really have no doubt that the erroneous victim impact testimony had no bearing on the jury's decision to sentence DeRosa to death for his crimes.

**142.** *See, e.g., Willingham,* 947 P.2d at 1086–87; *see also Cargle,* 909 P.2d at 835 (discussing appropriate role of victim impact evidence within overall capital sentencing scheme).

**143.** *See id.* at 828–29 (promulgating victim-impact jury instruction used in DeRosa's case).

and reject all of DeRosa's victim impact challenges accordingly.

¶ 84 In Proposition VII, DeRosa argues that the aggravating circumstance that the murders of Curtis and Gloria Plummer were committed "for the purpose of avoiding or preventing a lawful arrest or prosecution" was not established by sufficient evidence in his case. To establish this aggravator the State must show that a murder was committed for the purpose of avoiding arrest or prosecution for a separate, predicate crime, apart from the murder itself.[144] The defendant's intent in this regard can be proven by circumstantial evidence.[145]

¶ 85 When the sufficiency of the evidence for an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State, to determine whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt.[146] The evidence presented during DeRosa's trial was more than sufficient to establish the "avoid arrest" aggravator for both murders.[147]

¶ 86 DeRosa began plotting the Plummer robbery approximately six months before it was actually accomplished. He attempted to recruit Chris Ford, and eventually did recruit Eric Castleberry and Scotty White, to help him rob his former employers, on the theory that the elderly couple would have a lot of cash in their home and would be an "easy target." The evidence presented at trial strongly suggests that the robbery, rather than the murders, was the primary goal of DeRosa's plan. Yet the evidence also shows that DeRosa was committed to the goal of not being caught or prosecuted for this robbery, and that he decided that killing the Plummers was the best way to accomplish this goal.

¶ 87 DeRosa organized and planned the robbery so as to avoid detection. He and Castleberry brought along gloves (and a sock) and wore them as they ransacked the Plummer home, looking for cash and other valuables to steal. They planned to dispose of their intended getaway vehicle (an old pickup parked at the Plummer home) by abandoning it on Sugarloaf Mountain.[148] And DeRosa told White to check back at the Plummer home shortly after he dropped them off, apparently intending to abort the plan if anyone else, other than the elderly couple, was present in the home.

¶ 88 Yet DeRosa and Castleberry did not bother to wear any kind of mask or disguise their appearance in any way. DeRosa was fully aware that the Plummers would recognize him; in fact, he relied upon this recognition as the means by which they would be allowed into the home. Unfortunately, this sinister plan succeeded. DeRosa and Castleberry not only brought knives with them, they also placed clothing to change into within Castleberry's car—suggesting that they both fully expected that their clothing could become bloody and soiled during the robbery.[149] And once the robbery was in process, DeRosa and Castleberry worked to-

---

144. *See Banks v. State,* 43 P.3d at 400; *Patton v. State,* 1998 OK CR 66, 973 P.2d 270, 297, *cert. denied,* 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999).

145. *Id.*

146. *See, e.g., Lockett v. State,* 2002 OK CR 30, 53 P.3d 418, 430, *cert. denied,* 538 U.S. 982, 123 S.Ct. 1794, 155 L.Ed.2d 673 (2003).

147. In a single sentence and without citation to authority, DeRosa asserts that he cannot be deemed to have murdered Gloria Plummer "for the purpose of avoiding arrest or prosecution," even if he can be held liable for her murder as an accomplice, because it was Castleberry who actually murdered her (by cutting her throat). We need not address this claim, because DeRosa has waived it by not adequately developing it. We do note that DeRosa himself stabbed Mrs. Plummer repeatedly, and that the medical examiner testified that the cause of her death was "multiple sharp force wounds" to her back and chest (inflicted by DeRosa), as well as her neck.

148. When they ended up stealing a much newer pickup, DeRosa decided that merely abandoning it would be "too obvious." So they submerged it in the Poteau City Lake instead.

149. The fact that DeRosa initially sought to obtain a gun for the robbery, but then chose not to use his mother's gun because it was registered in her name, further indicates DeRosa's intention not to leave any evidence in the Plummer home that could be used to connect him with the home, as well as his expectation that accomplishing the robberies would include the use of deadly force.

gether to ensure that it was not impeded and that they would not be caught.[150]

¶ 89 Although Castleberry never actually admitted that he and DeRosa went to the Plummer home expecting and intending to kill the elderly couple, in order to avoid being arrested or prosecuted for robbing them, this inference is inescapable from the evidence presented at trial—including the evidence that DeRosa later stated that his plan had gone "perfectly," until Scotty White squealed to the police.[151] The evidence presented at trial was more than sufficient to establish, beyond a reasonable doubt, that DeRosa planned and accomplished the murders of Curtis and Gloria Plummer in order to avoid arrest and prosecution for robbing them. The robbery, which was separately planned and carried out, was an entirely distinct crime.[152]

¶ 90 In a sub-section entitled, "Constitutionally Overbroad As Applied to this Case," DeRosa argues that it would be an

unconstitutionally broad interpretation of the "avoid arrest" aggravator to hold that it is established merely by showing that another felony occurred "in close temporal proximity" to a murder. Yet this Court has never adopted such a minimal interpretation of the aggravator. Although DeRosa may not agree with this Court's *application* of the aggravator in the cases that he cites, DeRosa does not establish that this Court has adopted an overly broad interpretation of the *requirements* for the aggravator or one that applies to nearly every murder.[153] As stated earlier, the "avoid arrest" aggravator requires the State to establish that the murder was committed "for the purpose of" avoiding arrest or prosecution for a separate, predicate crime. And this aggravator is certainly not "overbroad as applied in this case." [154]

¶ 91 In Proposition VIII, DeRosa argues that the trial court erred by refusing to instruct the jury on the "heinous, atrocious, or cruel" aggravating circumstance by using the instruction requested by his coun-

---

**150.** Castleberry pulled a phone cord out of the wall, and DeRosa held the Plummers at knifepoint as Castleberry began going through the home. When they started resisting, DeRosa stabbed them repeatedly. After Castleberry returned and slit the throat of Gloria Plummer and stabbed Curtis Plummer in the back, DeRosa threw a marble-topped table at Curtis Plummer and savagely slit his throat as well. The State notes the efforts of DeRosa and Castleberry, after leaving the Plummer home, to dispose of evidence relating to their crimes (*e.g.*, burning their bloody clothing and disposing of their knives and shoes), but we do not rely on this evidence herein, since it is not necessarily probative of DeRosa's intent to avoid prosecution for the robbery, as opposed to the murders. The evidence supporting the aggravator is overwhelming, even without considering these later actions.

**151.** Whether White realized beforehand that the Plummers were going to be killed is unclear.

**152.** The current case almost exactly parallels *McElmurry v. State*, 2002 OK CR 40, 60 P.3d 4. In *McElmurry*, the defendant and his wife went to the "secluded country residence" of an elderly couple for whom they had recently done yard work. They intended to rob the couple, who they assumed had "a lot of money," but did not attempt to conceal their identities. After knocking on the door and being invited into the home, they visited with their former employers, and then robbed and brutally killed them. We upheld the "avoid arrest" aggravators in that case. *See id.* at 13–14, 26–27. On the other hand, the current

case is entirely unlike *Williams v. State*, 2001 OK CR 9, 22 P.3d 702, *cert. denied*, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002), which DeRosa invokes. In *Williams*, this Court found that an "attempted rape" (for which the evidence was minimal) was part of a continuing transaction that resulted in the victim's death, rather than a separate crime. *Id.* at 723.

**153.** *See Arave v. Creech*, 507 U.S. 463, 476–77, 113 S.Ct. 1534, 1543, 123 L.Ed.2d 188 (1993) ("[T]he question whether state courts properly have applied an aggravating circumstances is separate from the question whether the circumstance, as narrowed, is facially valid."); *see also Lewis v. Jeffers*, 497 U.S. 764, 779, 110 S.Ct. 3092, 3101, 111 L.Ed.2d 606 (1990) ("[I]f a State has adopted a constitutionally narrow construction of a vague aggravating circumstance, and if the State has applied that construction to the facts of the particular case, then the 'fundamental constitutional requirement' of 'channeling and limiting ... the sentencer's discretion in imposing the death penalty' ... has been satisfied.") (quoting *Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988)).

**154.** The State overwhelmingly established not merely two murders in "close temporal proximity" to a robbery, but that the murders of Curtis and Gloria Plummer were committed *for the purpose of* avoiding arrest or prosecution for the robbery committed against them that same evening.

sel. DeRosa also argues that the manner in which this aggravating circumstance has been applied and upheld by this Court has resulted in an overly broad interpretation of the aggravator, noting cases from the United States Court of Appeals for the Tenth Circuit questioning this Court's application of the aggravator. Yet, as just noted, an aggravating circumstance does not itself become "overly broad" or unconstitutional simply because a state appellate court applies it in a manner with which defendants, or even federal appellate courts, disagree.[155]

¶ 92 In DeRosa's case, the jury instruction given by the trial court to define the "heinous, atrocious, or cruel" aggravating circumstance largely tracked the instruction proposed by defense counsel, and went substantially beyond the current uniform instruction for this aggravator, OUJI–CR(2d) 4–73.[156] The instruction left out, however, the following two sentences proffered by defense counsel: (1) "The term 'serious physical abuse' refers to the infliction of gratuitous violence beyond the act of killing."; and (2) "The term 'conscious physical suffering' refers to suffering in addition to that brief period of conscious suffering present in virtually all murders." DeRosa challenges the trial court's refusal to include these two definitions in the jury instruction in his case.[157]

¶ 93 This Court finds that the trial court did not abuse its discretion in declining to modify the uniform jury instruction for the "heinous, atrocious, or cruel" aggravating circumstance in the manner requested by DeRosa. Although the proposed language equating "serious physical abuse" with "gratuitous violence ... beyond the act of killing" does appear within this Court's decision in *Hawkins v. State*,[158] even *Hawkins* did not require that the jury be instructed on this definition.[159] Furthermore, this Court has not treated this *Hawkins* dicta as establishing a binding definition of "serious physical abuse," and we decline to do so here. DeRosa cites no authority from this Court supporting his proposed definition of "conscious physical suffering," and we likewise decline to adopt the proposed definition as part of the uniform jury instruction for this aggravating circumstance.[160] Hence DeRosa's appeal on this basis is rejected. The trial court did not abuse its discretion in refusing to instruct DeRosa's jury in the manner proposed by defense counsel.

¶ 94 Nevertheless, the State acknowledges that the instruction given by the trial court "represents an improvement over the uniform instruction as it now stands." In particular, the State commends the trial court for including the language about "conscious

**155.** *See* cases cited in note 153 *supra*.

**156.** The instruction given by the trial court stated as follows:

The State has alleged that the murder was "especially heinous, atrocious, or cruel." This aggravating circumstance is not established unless the State proves beyond a reasonable doubt:
*First,* that the murder was preceded by either torture or serious physical abuse, as those terms are defined in this instruction;
*Second,* that as a result, the victim experienced conscious physical suffering; and
*Third,* that the facts and circumstances of this case establish that the murder was heinous, atrocious, or cruel, as those terms are defined in this instruction.
The term "torture" used in this instruction[ ] refers to the infliction of great physical anguish or extreme mental cruelty.
The term "heinous" means extremely wicked or shockingly evil. The term "atrocious" means outrageously wicked and vile. The term "cruel" means pitiless, or designed to

inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others.

**157.** The trial court also modified defense counsel's proposed definition of "torture" and omitted a portion of it, but DeRosa is not appealing the trial court's decision in this regard.

**158.** *See Hawkins v. State*, 1994 OK CR 83, 891 P.2d 586, 596–97 ("No evidence of serious physical abuse, that is, gratuitous violence inflicted on the victim beyond the act of killing, is present in this case."), *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

**159.** The *Hawkins* Court specifically found that the "trial court properly instructed the jury" regarding the "heinous, atrocious, or cruel" aggravator, even though the instruction in that case did not even mention "gratuitous violence." *Id.* at 596.

**160.** Furthermore, this Court finds that the proposed instruction would not be helpful to and could confuse jurors, who would likely not feel confident that they were adequately familiar with

physical suffering" by the victim, which has caused so much litigation and controversy in state and federal courts. The State correctly notes, however, that the requirement that a jury always find "conscious physical suffering," in order to apply the "heinous, atrocious, or cruel" aggravator, inappropriately forecloses the possibility of applying the aggravator to cases in which no *physical* suffering occurred prior to the murder, but where the murder was preceded by "torture" in the form of infliction of "extreme mental cruelty." This limitation of the aggravator is not supported by our caselaw.[161]

¶ 95 The State suggests that we should modify our uniform instruction on the "heinous, atrocious, or cruel" aggravating circumstance at this time, particularly in light of the decision by the United States Supreme Court in *Ring v. Arizona*.[162] We agree.[163]

 ¶ 96 This Court finds that the following instruction shall replace the current version of OUJI–CR(2d) 4–73 and that it shall be used in all future capital murder trials in which the State is alleging the "heinous, atrocious, or cruel" aggravating circumstance.

The State has alleged that the murder was "especially heinous, atrocious, or cruel." This aggravating circumstance is not established unless the State proves beyond a reasonable doubt:

*First,* that the murder was preceded by either torture of the victim or serious physical abuse of the victim; and

*Second,* that the facts and circumstances of this case establish that the murder was heinous, atrocious, or cruel.

You are instructed that the term "torture" means the infliction of either great physical anguish or extreme mental cruelty. You are further instructed that you cannot find that "serious physical abuse" or "great physical anguish" occurred unless you also find that the victim experienced conscious physical suffering prior to his/her death.

In addition, you are instructed that the term "heinous" means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others.

This instruction does not change any of the legal requirements of the "heinous, atrocious, or cruel" aggravating circumstance as it has existed up until this time.[164] Rather, it is intended to more fully inform the jury regarding the findings that must be made in order to properly apply the aggravator and to ensure that a jury determination is made regarding each of these findings.

¶ 97 This opinion should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate, and this Court does not hold thus. Hence cases in which the former instruction has been used and applied are not subject to reversal on this basis. Such cases will be evaluated in the same manner as they have been in the past. In all future capital trials in which the State alleges that the "heinous, atrocious, or cruel" aggravating circumstance applies, however, the newly revised uniform

"that brief period of conscious suffering present in virtually all murders."

**161.** *See, e.g., Berget v. State,* 1991 OK CR 121, 824 P.2d 364, 373 ("Torture may include the infliction of either great physical anguish or extreme mental cruelty."), *cert. denied,* 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992).

**162.** *See Ring v. Arizona,* 536 U.S. 584, 589, 122 S.Ct. 2428, 2432, 153 L.Ed.2d 556, 564 (2002) (holding that "[c]apital defendants, no less than noncapital defendants, ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment"); *id.* at 602, 122 S.Ct. at 2439 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a

fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.").

**163.** We do not, however, adopt the exact version of the new instruction that the State proposes.

**164.** *See, e.g., Stouffer v. State,* 1987 OK CR 166, 742 P.2d 562, 563 (restricting application of "heinous, atrocious, or cruel" aggravator to "instances of death preceded by torture or serious physical abuse"), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988); *Spears v. State,* 1995 OK CR 36, 900 P.2d 431, 448–49 ("Serious physical abuse requires evidence of *conscious* suffering.") (emphasis in original), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995).

instruction, OUJI–CR(2d) 4–73, as stated above, shall be used.

¶ 98 The Court notes that although the jury instruction given by the trial court in DeRosa's case is somewhat different than the new uniform instruction, the instruction given in his case was actually more demanding than the new uniform instruction—since it (incorrectly) required that "conscious physical suffering" be found in every case in which the "heinous, atrocious, or cruel" aggravator is applied. Hence DeRosa could not have been prejudiced by the instruction given in his case.

■ ¶ 99 This Court further finds that the "heinous, atrocious, or cruel" aggravating circumstance, as applied to both Curtis and Gloria Plummer, was supported by sufficient evidence at trial.[165] Given the sequence of events testified to by Castleberry and the physical evidence in the case, the murders of Mr. and Mrs. Plummer were certainly preceded by serious physical abuse and conscious physical suffering.[166] Hence the "heinous, atrocious, and cruel" aggravating circumstance was supported by more than sufficient evidence and was appropriately applied to the murders of Curtis and Gloria Plummer.

## CUMULATIVE ERROR ANALYSIS

¶ 100 In Proposition IX, DeRosa claims that even if no individual error in his case merits reversal, the cumulative effect of the errors committed during his trial necessitates reversal of his convictions or modification of his sentences. This Court has recognized that when there are "numerous irregularities during the course of [a] trial that tend to prejudice the rights of the de-

fendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial."[167] We have thoroughly reviewed DeRosa's claims for relief and the record in this case and conclude that although his trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief, because they did not render his trial fundamentally unfair, taint the jury's verdicts, or render his sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively. As we have stated repeatedly, DeRosa was convicted and sentenced to death based upon properly admitted evidence, in both stages of his trial. His convictions and death sentences were not the result of trial court error, prosecutorial misconduct, or improper evidence or witness testimony, even when considered in combination.

## MANDATORY SENTENCE REVIEW

■ ¶ 101 In accordance with 21 O.S. 2001, § 701.13(C), this Court must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of statutory aggravating circumstances. Upon review of the record, we conclude that DeRosa's death sentences were not imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor.

¶ 102 Regarding the two aggravating circumstances found by DeRosa's jury, i.e., that the murders of Curtis and Gloria Plummer

---

165. Although DeRosa acknowledges in his reply brief that he is not making a sufficiency of the evidence challenge regarding this aggravator, this finding is part of our mandatory sentence review. See 21 O.S.2001, § 701.13(C).

166. The evidence presented at trial overwhelmingly established that the murders were preceded by serious physical abuse, during which time both Mr. and Mrs. Plummer experienced conscious physical suffering. The testimony of the medical examiner and Eric Castleberry about the numerous injuries inflicted upon them both, the "vertical" blood patterns on their clothing and skin, the blood stain patterns in various parts of the den, the "defensive wounds" on Mrs. Plum-

mer, the blood on the socks of Mr. Plummer, and the blood on the feet of Mrs. Plummer indicate that both victims survived for a substantial period of time after they were first stabbed. During this period of time, they were moving about the room and resisting what was happening. They certainly would have been experiencing conscious physical suffering.

167. See Lewis v. State, 1998 OK CR 24, 970 P.2d 1158, 1176, cert. denied, 528 U.S. 892, 120 S.Ct. 218, 145 L.Ed.2d 183 (1999); Matthews v. State, 2002 OK CR 16, 45 P.3d 907, 924, cert. denied, 537 U.S. 1074, 123 S.Ct. 665, 154 L.Ed.2d 570 (2002).

were "especially heinous, atrocious, or cruel," and were "committed for the purpose of avoiding or preventing a lawful arrest or prosecution," this Court has already found that the evidence presented at trial adequately supports the jury's finding of these aggravators.[168] Upon our review of the record, we conclude that DeRosa's convictions and death sentences are factually substantiated and appropriate.

## DECISION

¶ 103 Finding no errors that warrant reversal or modification, DeRosa's **CONVICTIONS** on two counts of First–Degree Felony Murder are **AFFIRMED.** His **SENTENCES** of death on each of these two counts are likewise **AFFIRMED.** Nevertheless, this case is **REMANDED** for correction of the Judgment and Sentence document, through an order *nunc pro tunc* by the district court, in accordance with this opinion.

JOHNSON, V.P.J. and STRUBHAR, J., concur.

LILE, J., and LUMPKIN, P.J., concur in results.

---

**168.** *See* Court's analysis of DeRosa's Propositions VII and VIII *supra*.